IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| RYCAR TRUST; RTM5 TRUST; RYAN THOMAS MANAGEMENT COMPANY, L.C., <br><br> Plaintiffs, <br><br> v. <br><br> YATES FAMILY INVESTMENTS, LLLP fka YATES FAMILY INVESTMENTS LTD; JEFFREY YATES; COOPER FAMILY INVESTMENTS, LP; FRED COOPER; CHANDLER FAMILY INVESTMENTS, LTD.; IAN CHANDLER; WILSON FAMILY HOLDINGS, LLC; MARK WILSON; TIMMER FAMILY INVESTMENTS, LLLP fka TIMMER FAMILY INVESTMENTS, LTD.; RILEY TIMMER, <br><br> Defendants. | **ORDER AND MEMORANDUM DECISION ON MOTIONS TO DISMISS** <br><br> Case No. 2:23-cv-00732-TC-DAO <br><br> Judge Tena Campbell <br> Magistrate Judge Daphne A. Oberg |

This action is a securities fraud lawsuit for damages brought by Plaintiffs Rycar Trust, RTM5 Trust, and Ryan Thomas Management Company LLC. The Plaintiffs allege that the misrepresentations, non-disclosures, and actions of Defendants Jeffrey Yates, Fred Cooper, Ian Chandler, Mark Wilson, and Riley Timmer induced the Plaintiffs to purchase interests in ARIIX LLC (ARIIX) and shares of NewAge, Inc. (NewAge) worth over $10,000,000. (Compl., ECF No. 2 at ¶ 1.) The Defendants have filed three motions to dismiss. Defendants Fred Cooper, Cooper Family Investments, LP, Mark Wilson, Wilson Family Holdings, LLC, Jeffrey Yates, and Yates Family Investments, LTD filed one motion (the Cooper motion, ECF No. 18). Defendants Riley Timmer and Timmer Family Investments, LTD filed a separate motion (the Timmer motion, ECF No. 19), as did Defendants Ian Chandler and Chandler Family

Investments, LP (the Chandler motion, ECF No. 20).  The court has considered the Plaintiffs'

Complaint in its entirety and, for the reasons discussed below, grants the motions to dismiss.

The court grants the Plaintiffs leave to amend their Complaint to the extent set out in this order.

## FACTUAL BACKGROUND

In 2011, the individual Defendants founded ARIIX, a multi-level marketing company

(MLM) and began serving as ARIIX officers.  (Compl. at ¶¶ 19–21.)[1]  Mr. Cooper became

ARIIX's Chief Executive Officer (CEO), while Mr. Yates and Mr. Wilson held the positions of

Chief Financial Officer (CFO) and President, respectively.  (Id. ¶ 21.)  Mr. Chandler served as

ARIIX's Vice President and Mr. Timmer served as Chief Operating Officer (COO).  (Id.)

Through these roles, the individual Defendants became acquainted with Thomas and LaDawn

Painter, trustees of the Rycar Trust and the RTM5 Trust.[2]  (Id. ¶¶ 5, 22–25.)  Mr. Painter was the

Plaintiffs' agent and representative at all relevant times.  (Id. ¶ 6.)  From meeting with Mr.

Painter, the individual Defendants learned that the Painters were managing substantial special

interest trust funds on behalf of their special needs children.  (Id. ¶ 25.)

Mr. Painter made three separate ARIIX investments on behalf of the Rycar and RTM5

Trusts, investing $3,281,800 total and obtaining a 3.5% interest.  (See id. ¶¶ 41, 53, 64, 67.)

### I.    First ARIIX Investment

The first ARIIX investment occurred in January 2015.  (Id. ¶¶ 41.)  The Plaintiffs allege

that at two meetings in November 2014, some of the individual Defendants made false and

---

[1] When considering a motion to dismiss, the court accepts all well-pled factual allegations in the complaint as true and construes them in the light most favorable to the non-movant.  See Strauss v. Angie's List, Inc., 951 F.3d 1263, 1267 (10th Cir. 2020).  The court adopts the Plaintiffs' version of events for the purposes of this order.

[2] The Complaint does not specify how the Painters are connected with Plaintiff Ryan Thomas Management Company, L.C. (RTM), but does state that RTM5 Trust "eventually transferred all of its shares in NewAge to Plaintiff RTM."  (Id. ¶ 128.)

misleading statements about ARIIX's finances to Mr. Painter and that those statements induced Mr. Painter to purchase interests in ARIIX on behalf of the Plaintiffs.  (Id. ¶¶ 29, 36–37, 41, 43.) At the first meeting, Mr. Cooper, Mr. Wilson, and Mr. Yates misrepresented ARIIX's gross revenue, ARIIX's profits, ARIIX's projected gross revenue, ARIIX's valuation, and ARIIX's profitability compared to similar businesses.  (Id. ¶¶ 29–35.)  These three Defendants also told Mr. Painter several times that ARIIX was making a lot of money and doing well, that business in China was growing exponentially, and that the valuation of ARIIX was six to ten times its earnings.  (Id. ¶ 29.)  Mr. Painter had another meeting in November 2014 with Mr. Yates, Mr. Cooper, and Mr. Wilson, where they repeated these misrepresentations.  (Id. ¶ 36–37.)  The Plaintiffs allege that "[t]he foregoing representations were false and misleading" and that the "Defendants did not disclose the inaccuracies relating to the foregoing information or the true reasons why they were willing to sell their referenced interests."  (Id. ¶¶ 38, 40.)

In January 2015, Mr. Painter invested $1,000,000 in ARIIX on behalf of the Plaintiffs. (Id. ¶ 41.)  The Rycar Trust purchased interests in ARIIX from Yates Family Investments, LTD; Wilson Family Holdings, LLC; Timmer Family Investments, LTD; and Cooper Family Investments, LP.  (See id.)  "Incident to each of the … purchase transactions, … [the] Defendant sellers, directly and/or indirectly, confirmed the various and foregoing factual inducements underlying Defendants' sales of securities were accurate … [and failed to] disclose the inaccuracies relating to the foregoing information or the true reasons why they were willing to sell[.]"  (Id. ¶ 42.)

## II.    Second ARIIX Investment

Mr. Painter made the second ARIIX investment on behalf of the Plaintiffs in 2016. According to the Plaintiffs, Mr. Cooper, Mr. Wilson, Mr. Chandler, and Mr. Yates "continued to

make untrue and misleading statements of material fact related to the financial state and future of ARIIX" from early 2015 through 2016.  (Id. ¶ 47.)  They told Mr. Painter that "ARIIX will generate revenue between $889 Million and $1.1 Billion in sales by 2022; … [b]usiness in China is growing dramatically and sales volumes are increasing; … [and] ARIIX is valued at $90 Million."  (Id.)  The Plaintiffs allege that, in reality, "ARIIX continued to struggle financially, with revenues and profits not nearly as high as claimed, as evidenced by its continued issues with cash flow, lack of profits and failure to make distributions."  (Id. ¶ 49.)

Based on the preceding statements, Mr. Painter invested an additional $1,000,000 in ARIIX on behalf of the Plaintiffs in or around January 2016.  (Id. ¶ 53.)  This time, Rycar Trust purchased interests in ARIIX from Yates Family Investments, LTD; Wilson Family Holdings, LLC; Timmer Family Investments, LTD; Chandler Family Investments, LP; and Cooper Family Investments, LP (collectively, the Corporate Defendants).  (Id.)

### III.    Third ARIIX Investment

Finally, Mr. Painter invested in ARIIX for a third time on behalf of the Plaintiffs in March and April 2017.  (Id. ¶ 64.)  In 2016 and 2017, Mr. Cooper, Mr. Yates, Mr. Timmer, and Mr. Wilson made representations to Mr. Painter that "ARIIX was continuing to do very well in achieving its goals, to make profits and to increase its gross revenues every month, including that ARIIX was worth at least $110,000,000 at that time."  (Id. ¶ 56.)  The Plaintiffs allege that when these statements were made, ARIIX was struggling financially.  (See id. ¶¶ 59–60.)  On or around April 10, 2017, Mr. Yates told the Painters that ARIIX moved its international profits offshore, effectively lowering its tax rate from 47% to 42.5%.  (Id. ¶ 62.)

These alleged misrepresentations induced the Painters to invest an additional $1,281,800 in ARIIX.  (Id. ¶ 64.)  The Rycar Trust purchased interests in ARIIX from Timmer Family

Investments, Ltd.; Yates Family Investments, Ltd.; and from a nonparty named Dewey Mackay. (Id.)

### IV.    NewAge Stock Purchases

A few years later, in January 2020, Mr. Cooper and Mr. Yates told Mr. Painter that ARIIX employees were developing a technology to update ARIIX's customer relationship management system.  (Id. ¶ 73.)  The technology—known as ICONN—was ARIIX's "new, highly confidential, proprietary and innovative software" that would help "track sales and commissions more accurately and effectively[.]"  (Id.)  Mr. Painter "was told that ICONN was a software owned solely by ARIIX and developed by ARIIX's personnel at ARIIX's expense, and that ICONN had been designed to give ARIIX a competitive advantage in the marketplace[.]"  (Id. ¶ 74.)  Mr. Cooper and Mr. Yates also represented that Mr. Cooper, among others, "had been and [was] integrally involved in the development of ICONN and that Cooper was an MLM compensation genius[.]"  (Id. ¶ 77.)  Mr. Painter understood ARIIX would also greatly benefit from Mr. Cooper's "exclusive provision of the ICONN design, development and commercialization."  (Id.)

In February 2020, ARIIX and NewAge began discussing the prospect of merging.  (Id. ¶ 80.)  "Upon information and belief, Cooper acted as one of ARIIX's point persons in approaching and negotiating the terms of the merger with NewAge with the knowledge and approval of some or all of the other Defendants, including Cooper, Yates and Wilson."  (Id. ¶ 82.)  Around this time, Mr. Yates told Mr. Painter about the impending merger between ARIIX and NewAge.  (Id. ¶ 92.)

But "[u]pon information and belief, while Cooper was negotiating the terms of the merger with NewAge on behalf of ARIIX, Cooper, Wilson and Yates were simultaneously

setting up" a competing company, called Kwikclick, Inc. (Kwikclick).  (Id. ¶¶ 78, 83.)  "Upon

information and belief, ARIIX terminated [its Chief Information Officer,]" who became

affiliated with Kwikclick shortly after.  (Id. ¶ 85.)  Without informing Mr. Painter, the Plaintiffs,

or ARIIX shareholders, the individual Defendants had already begun a transfer of the ICONN

software to Kwikclick.  (Id. ¶¶ 78–79, 86, 91.)  Moreover, upon information and belief, "Cooper

directed and caused ARIIX to continue to pay [its Chief Information Officer]'s salary … [and]

instructed ARIIX's software development team in China to devote a significant amount of time

and attention to the development of the Kwikclick software."  (Id. ¶¶ 87–88.)

Shortly after Kwikclick's founding, several Defendants, including Mr. Cooper, Mr.

Wilson, and Mr. Yates, became affiliated with Kwikclick as officers and/or employees.  (Id.

¶ 84.)  "Upon information and belief, ARIIX did not disclose to NewAge prior to the [ARIIX-

NewAge] merger that its developers were devoting significant time to the development of the

Kwikclick software, nor did ARIIX disclose that a copy of the ICONN software source code had

been provided to Kwikclick."  (Id. ¶ 89.)  "Upon information and belief, other ARIIX corporate

resources were used to develop Kwikclick's software and otherwise advance Kwikclick's

business."  (Id. ¶ 90.)

Around July 20, 2020, NewAge publicly announced the merger, and the individual

Defendants began making false and misleading statements to gain ARIIX shareholder approval

for the merger.  (Id. ¶¶ 93–94, 97–101.)  For example, Mr. Cooper and Mr. Yates made the

following representations to the Plaintiffs: "NewAge will make an additional $20 Million in

annualized earnings before interest, taxes, depreciation or amortization.…  NewAge will buy

products at a discount not previously available….  Cooper would be the Chairman of the Board

of NewAge after the merger.… [and] ARIIX's fair valuation for purposes of the merger will be

$220,000,000.00." (Id. ¶ 94.)  Mr. Cooper and Mr. Yates also told Mr. Painter that ARIIX had

more than $11 million dollars in working capital and that ARIIX would merge at a price between

$5.50 and $6.00 per share.  (Id. ¶¶ 95, 103.)

Based on these representations, Mr. Painter purchased several million dollars of NewAge

stock.  The Complaint alleges that between July 2020 and December 2020, Mr. Painter

purchased 7,000,000 shares in NewAge for $6,845,689.  (Id. ¶ 109.)  The Complaint also alleges

that Mr. Painter purchased approximately $8,785,307 worth of NewAge shares.  (Id. ¶ 96.)  It is

unclear whether these figures refer to the same or separate investments.[3]

Mr. Painter became skeptical about ARIIX and the individual Defendants after the

merger yielded less value than expected.  (See id. ¶¶ 105, 107.)  Mr. Painter expected to receive

shares valued at $7,700,000, but he only received 1,437,176 shares valued at $1.74 per share for

a total value of $2,500,686.  (Id. ¶ 105.)  In March 2021, Mr. Yates represented to Mr. Painter

that an additional 157,208 shares of NewAge would be issued to "RTM[,]" but such shares were

never issued.  (Id. ¶ 106.)  In response to Mr. Painter's concerns, Mr. Yates told Mr. Painter that

NewAge stock would reach $20 per share (up from $1.74 per share at the time of the merger) in

the near future.  (Id. ¶¶ 105, 107.)

The Plaintiffs allege that the actions the individual Defendants took before and after the

---

[3] The Complaint states that the merger finalized around May 2021 (see id. at ¶ 105), but this date
appears to be an error.  The merger decision was formally announced in July 2020 (see id. ¶ 93)
and a Google search reveals that NewAge completed the acquisition of ARIIX on November 16,
2020.  The other dates in the Complaint, such as the Plaintiffs' allegation that Mr. Yates offered
to issue additional NewAge shares to RTM in March 2021 (see id. ¶ 106), are compatible with a
final merger in November 2020, not May 2021.  Given this confusion, the court is uncertain
whether the Complaint alleges that Plaintiffs purchased $6.8 million (see id. ¶ 109), $8.7 million
(see id. ¶ 96), or $15.5 million (combining these two amounts) worth of NewAge shares.  The
Plaintiffs request damages of $17 million (see id. ¶ 142), which suggests that the combined
figure is accurate.  But the timeline is muddy at best and requires clarification in the Plaintiffs'
Amended Complaint.

merger led to NewAge's financial decline, resulting in its eventual bankruptcy.  (Id. ¶ 125.)[4]
After the merger, according to the Plaintiffs, the individual Defendants became officers of
NewAge: Mr. Cooper became director; Mr. Wilson, President; Mr. Yates, Executive Vice
President; Mr. Chandler, the Greater China President; and Mr. Timmer, the Global Head of
Investor Relations.  (Id. ¶¶ 113–17.)  Mr. Cooper instructed an employee to draft and backdate a
"sham agreement" between ARIIX and Kwikclick concerning the ICONN source code, but no
such agreement had been disclosed to shareholders as part of the merger.  (Id. ¶ 111.)  Mr.
Cooper also instructed NewAge employees to help expedite the development of Kwikclick even
though it would cost NewAge $200,000 per month, and "NewAge proceeded to incur this
additional expense for the benefit of Kwikclick."  (Id. ¶ 119.)  Mr. Cooper also helped execute a
Software Licensing and Exclusivity Agreement between NewAge and Kwikclick that contained
terms favorable to Kwikclick and detrimental to NewAge—including an agreement that NewAge
would pay Kwikclick a licensing fee of $50,000 per month.  (Id. ¶¶ 121, 123.)  During this time,
Mr. Cooper, Mr. Wilson, and Mr. Yates began using NewAge's corporate resources to channel
business to Kwikclick.  (Id. ¶ 124.)  Finally, the individual Defendants engaged in efforts to
increase NewAge's cost of goods.  (Id. ¶ 132.)

The Plaintiffs allege that all this together amounted to a carefully orchestrated decision by
the individual Defendants to merge ARIIX with NewAge for their own benefit and the benefit of
their company, Kwikclick.  (Id. ¶¶ 130–31.)

### V.     Procedural Background

The Plaintiffs filed their Complaint against all Defendants on October 13, 2023.  (See
Compl.)  The Plaintiffs asserted several causes of action against the Defendants: 1) a violation of

---

[4] All the facts referred to in this paragraph are based upon the Plaintiffs' information and belief.
(See id. ¶¶ 111–25, 131–32.)

Section 10(b) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated under the Exchange Act, 17 C.F.R. § 240.10b-5; 2) a violation of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t; 3) a violation of Section 12(a)(2) of the Securities Act of 1933 (Securities Act), 15 U.S.C. § 77l(a); 4) a violation of the Utah Uniform Securities Act (UUSA), Utah Code Ann. § 61-1-1; 5) common law fraud; 6) negligent misrepresentation; and 7) civil conspiracy.  (Compl. at ¶¶ 135–85.)

## LEGAL STANDARD

"To survive a [Federal] Rule 12(b)(6) motion to dismiss, a plaintiff's complaint must allege sufficient facts 'to state a claim to relief that is plausible on its face.'"  Strauss v. Angie's List, Inc., 951 F.3d 1263, 1266 (10th Cir. 2020) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  When a "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged[,]" a claim is facially plausible.  Id. at 1267 (citation omitted).  The court must "accept all well-pled factual allegations as true and view these allegations in the light most favorable to the nonmoving party."  Id. (citation omitted).  But this rule is inapplicable to legal conclusions and to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  Courts deciding a motion to dismiss a securities fraud complaint must evaluate "the totality of the pleadings" to determine whether a plaintiff has stated a claim.  Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1092 (10th Cir. 2003).

## DISCUSSION

The Defendants assert that the court should dismiss the Complaint for the following reasons: 1) the Plaintiffs' Section 10(b) and UUSA claims are time barred; 2) the Plaintiffs' Section 10(b) cause of action fails to satisfy the heightened pleading requirements of Rule 9 of

the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act; 3) the

Plaintiffs fail to plead loss causation, an element of their Section 10(b) claim; 4) the Plaintiffs'

Section 20(a) claim fails to plead a primary violation and to plead control; 5) the Plaintiffs'

Section 12(a)(2) claim does not provide a cause of action; and 6) the Plaintiffs' state law claims

should be dismissed for lack of jurisdiction.  (See ECF No. 18 at 2.)  The Timmer and Chandler

motions incorporate these arguments and additionally assert that the Plaintiffs' allegations

against Mr. Timmer and Mr. Chandler are limited.  (See ECF Nos. 19 & 20.)

## I.      Statute of Limitations

The Plaintiffs allege that the Defendants have violated Section 10(b) of the Exchange

Act, 15 U.S.C. § 78j(b), and its implementing regulation, 17 C.F.R. § 240.10b-5 (Rule 10b-5).

Section 10(b) of the Exchange Act states that "[i]t shall be unlawful for any person … [t]o use or

employ, in connection with the purchase or sale of any security[,] … any manipulative or

deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may

prescribe as necessary …."  15 U.S.C. § 78j(b).  The SEC has promulgated Rule 10b-5 to

implement Section 10(b).  Rule 10b-5 prohibits the following acts:

> (a) To employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue
> statement of a material fact or to omit to state a material fact necessary in order to
> make the statements made, in the light of the circumstances under which they
> were made, not misleading, or (c) [t]o engage in any act, practice, or course of
> business which operates or would operate as a fraud or deceit upon any person, in
> connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

Courts previously applied a one-year statute of limitations to Section 10(b) claims.  In re

Qwest Commc'ns Int'l, Inc. Sec. Litig., 387 F. Supp. 2d 1130, 1141 (D. Colo. 2005).  But

following the passage of the Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 801, "a

private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in

contravention of a regulatory requirement concerning the securities laws … may be brought not later than the earlier of—(1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation."  28 U.S.C. § 1658(b).

"Courts uniformly treat Section 1658(b)(1) [the two-year provision] as a statute of limitations and Section 1658(b)(2) [the five-year provision] as a statute of repose."  In re Teva Sec. Litig., 512 F. Supp. 3d 321, 332 (D. Conn. 2021); see also Hogan v. Pilgrim's Pride Corp., 73 F.4th 1150, 1156 (10th Cir. 2023) ("While § 1658(b)(1) is a statute of limitations, § 1658(b)(2) is a statute of repose.").  A "statute of limitations … begins running when an injury is discovered or reasonably should have been discovered[.]"  Nat'l Credit Union Admin. Bd. v. Nomura Home Equity Loan, Inc., 764 F.3d 1199, 1224 (10th Cir. 2014).  In contrast, a "statute of repose … is a fixed, statutory cutoff date, usually independent of any variable, such as claimant's awareness of a violation."  Id. (citation omitted).  Unlike statutes of limitations, "statutes of repose cannot be tolled absent a particular indication that the legislature did not intend the statute to provide complete repose but instead anticipated the extension of the statutory period under certain circumstances."  Hogan, 73 F.4th at 1156 (citation omitted).

Given that the Plaintiffs filed the Complaint in this case on October 13, 2023, the Defendants argue that the Plaintiffs' Section 10(b) and UUSA claims,[5] as they relate to the Plaintiffs' purchases of interests in ARIIX, are barred by the five-year statute of repose.  The Defendants assert that the statute of repose begins to run "after [each] violation of the Exchange Act."  (ECF No. 18 at 16.)  In support of this position, the Defendants note that "[t]he Supreme Court has made strong caution regarding equitable tolling of statutes of repose."  (Id. (citing Cal. Public Emps.' Ret. Sys. v. ANZ Sec., Inc., 582 U.S. 497, 508 (2017).)  Under the Defendants'

---

[5] The UUSA has the same time limitations on bringing an action, see Utah Code Ann. § 61-1-22(7).

view, the statute of repose begins running from the date of each alleged violation of Section 10(b): each alleged misstatement and omission.

In contrast, the Plaintiffs contend that the clock begins to run on "the date of the last … act or omission of the defendant" that could give rise to liability.  (Resp. in Opp'n to Mot. Dismiss, ECF No. 28 at 17 (citing ANZ, 582 U.S. at 498).)  This last act or omission occurred as late as 2021 according to the Plaintiffs' Complaint.  (See Compl. at ¶¶ 106, 120.)

"[T]he question of when the Repose Clock begins to tick in a Section 10(b) case is a relatively open issue."  In re Teva, 512 F. Supp. 3d at 331.  Since the passage of the Sarbanes-Oxley Act of 2002, neither the Supreme Court nor the Tenth Circuit has decided when the statute of repose clock begins to run in a Section 10(b) case.[6]  But district courts in other circuits have agreed with the Defendants' position that each misstatement begins the clock for the statute of repose.  In re Teva, 512 F. Supp. 3d at 335 (noting that because "a plaintiff can establish that a defendant has 'violated' Section 10(b) by alleging just a single misstatement or omission[,] … numerous district courts have held that a Repose Clock starts ticking when each alleged misstatement or omission is made."); Kuwait Inv. Off. v. Am. Int'l Grp., Inc., 128 F. Supp. 3d 792, 807 (S.D.N.Y. 2015) ("[T]he statute of repose runs from the date of each relevant misstatement or omission[.]").

The court finds that the statute of repose begins to run from the date of each alleged violation of Section 10(b).  The Tenth Circuit has clarified that "statutes of repose are enacted to give more explicit and certain protection to defendants."  Hogan, 73 F.4th at 1156 (citation

---

[6] In Sterlin v. Biomune Systems, the Tenth Circuit relied on the Court's discussion in Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350 (1991) concerning the "proper limitations period for § 10(b) [of the Exchange Act] and Rule 10b-5 claims[,]" 154 F.3d 1191, 1195 (10th Cir. 1998), but Lampf was superseded by the passage of 28 U.S.C. § 1658(b).  See Merck & Co., Inc. v. Reynolds, 559 U.S. 633 (2010).

omitted).  And the court disagrees with the Plaintiffs that Supreme Court precedent supports their

position.  The Plaintiffs cite <u>ANZ</u> for the proposition that "statutes of repose begin to run on 'the

date of the last culpable act or omission of the defendant.'"  <u>ANZ</u>, 582 U.S. at 505.  But <u>ANZ</u>

was not a Section 10(b) Exchange Act case.  <u>In re Teva</u>, 512 F. Supp. 3d at 335 ("The Court's

language … cannot be taken to mean that, in a Section 10(b) case, a 'violation' for the purposes

of Section 1658(b)(2) occurs only upon the last culpable act or omission, rather than with each

culpable act or omission.").

Alternatively, the Plaintiffs argue that their claims are timely under a theory of scheme

liability.  The Plaintiffs claim that the Defendants violated Section 10(b) and Rule 10b-5 not only

by making untrue statements of material fact or omitting to state material facts, but by engaging

in an unlawful "scheme."  <u>See</u> 17 C.F.R. § 240.10b-5(a)–(c); <u>see</u> <u>Malouf v. Sec. & Exch.</u>

<u>Comm'n</u>, 933 F.3d 1248, 1253, 1259 (10th Cir. 2019) (recognizing that there are two categories

of causes of action under Section 10(b): 1) the making of a materially untrue or misleading

statement and 2) employment of a fraudulent or deceptive scheme).

"[T]he two circuit courts that traditionally see the most securities cases[,] the Second and

Ninth Circuits, along with a majority of the other circuits, have adopted the term [scheme

liability] to describe the liability [R]ule 10b-5(a) and (c) creates."  <u>SEC v. Goldstone</u>, 952 F.

Supp. 2d 1060, 1203 (D.N.M. 2013) (citation omitted).  In contrast, "[m]isrepresentations and

most omissions fall under the prohibition of Rule 10b-5(b)[.]"  <u>Desai v. Deutsche Bank Sec.,</u>

<u>Ltd.,</u> 573 F.3d 931, 938 (9th Cir. 2009).  "Scheme liability recognizes that '[c]onduct itself can

be deceptive'" and "requires proof of participation in an illegitimate, sham, or inherently

deceptive transaction where the defendant's conduct or role has the purpose and effect of

creating a false appearance."  <u>SEC v. St. Anselm Exploration Co.</u>, 936 F. Supp. 2d 1281, 1298

(D. Colo. 2013) (quoting Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 158 (2008)); see also Smith v. LifeVantage Corp., 341 F.R.D. 82, 98 (D. Utah 2022) ("Unlike most securities-fraud claims, which are based on false statements or misleading omissions, scheme liability claims are based on deceptive or manipulative conduct that is distinct from any false statement or omission a defendant has made.").

Scheme "liability does not arise simply by virtue of repackaging a fraudulent misrepresentation [as] a 'scheme to defraud.'" St. Anselm, 936 F. Supp. 2d at 1298 (quoting Pub. Pension Fund Grp. v. KV Pharm. Co., 679 F.3d 972, 987 (8th Cir. 2012)); see also SEC v. Rio Tinto PLC, 41 F.4th 47, 55 (2d Cir. 2022). Courts have emphasized that the provisions of Rule 10b-5 must be kept distinct from each other so that litigants cannot repackage their misrepresentations and omissions claims into scheme liability claims to avoid procedural requirements, including heightened pleading standards and time limitations. Rio Tinto, 41 F.4th at 55; see In re Teva, 512 F. Supp. 3d at 336 ("[C]ourts must scrutinize pleadings to ensure that misrepresentation or omission claims do not proceed under the scheme liability rubric." (quoting In re Smith Barney Transfer Agent Litig., 884 F. Supp. 2d 152, 161 (S.D.N.Y. 2012)).

The Supreme Court has rejected a scheme liability claim based on conduct which happened to be the basis of the plaintiffs' false statement claim. Stoneridge, 552 U.S. 148, 153–55, 160–61 (finding that the public only became aware of the alleged misconduct through false statements that were challenged separately). Several courts have similarly rejected scheme liability claims where a complaint focuses on misstatements and omissions. See, e.g., In re Teva, 512 F. Supp. 3d at 335–37 (rejecting the plaintiffs' theory of scheme liability because: 1) the plaintiffs' case was "plainly [a] misstatements and omissions case[]" in which the plaintiffs alleged that the defendants violated the federal securities laws by lying about their sources of

revenue and the competitiveness of the generic drug manufacturing market; 2) the plaintiffs

failed to advance a theory of scheme liability until the hearing on the motion to dismiss; and 3)

the complaint "repeatedly emphasize[d] the … [d]efendants' misstatements and omissions—and

recount[ed] a litany of them at significant length.").  "Courts rightly insist that a plaintiff who

intends to bring a Rule 10b-5 claim based on both misstatement and scheme liability must do so

clearly and specifically."  Id. at 337 (emphasis added) (citing In Re Smith, 884 F. Supp. 2d at

160–61).  Furthermore, "it appears that … plaintiffs routinely proceed by alleging Rule 10b-5

claims in two separate counts—one based on misstatements and one based on scheme liability."

Id.; see W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc., 57 F. Supp. 3d 950, 981

(D. Minn. 2014) (denying motion to dismiss count of scheme liability that was pled separately

from count alleging misrepresentations and omissions).

     Here, the Plaintiffs allege one count of securities fraud in violation of Section 10(b) (and

Rule 10b-5) without specifying which provision of the regulation the Defendants violated.

(Compl. at ¶¶ 135–42.)  Although the Plaintiffs' Complaint includes language from all three of

Rule 10b-5's provisions, the Complaint in its entirety shows that the Plaintiffs are alleging that

the Defendants are liable for misstatements and omissions.  The Complaint recounts at length the

Defendants' misstatements and omissions that allegedly materially induced the Plaintiffs'

purchases of interests in ARIIX and shares of NewAge.  (See id. ¶¶ 29, 37, 41, 47, 73–74, 77–79,

94, 104, 106–07, 109–11; see also ECF No. 28 at 3 ("Defendants misrepresented that the ICONN

software was exclusively ARIIX's, that it would be NewAge's future, that it would make the

company much more profitable[.]…  Defendants' further misrepresentations and non-disclosures

regarding ICONN caused, at least in part, Plaintiffs to purchase additional NewAge stock after

the merger.").)

The Plaintiffs further claim that the Defendants engaged in deceitful acts that went beyond misrepresentations—specifically, by founding Kwikclick, transferring the ICONN software to Kwikclick, entering a licensing agreement with terms unfavorable to NewAge, and otherwise using NewAge's resources to benefit Kwikclick.  But these actions all occurred in 2020, several years after the Plaintiffs' earlier investments in ARIIX.  To the extent that the Plaintiffs wish to plead a separate count of scheme liability in an amended complaint, the court finds that any scheme is connected to the NewAge merger and the development of Kwikclick, not to the initial investments in ARIIX.

The court therefore grants the Defendants' motions to dismiss the Plaintiffs' claims which relate to the Plaintiffs' initial purchases of interests in ARIIX that occurred before October 13, 2018.  While the alleged misstatements and omissions concerning the ARIIX investments "cannot themselves constitute a 'violation' of Section 10(b), they may still be relevant because they provide background and context to the … Plaintiffs' Section 10(b) claims that rely on timely misstatements and omissions."  In re Teva, 512 F. Supp. 3d at 335.  In their Amended Complaint, the Plaintiffs are limited to alleging violations of Section 10(b) and Rule 10b-5 that occurred on and following October 13, 2018.

## II.     Heightened Pleading Standard

The Defendants argue that the Plaintiffs have failed to allege their Section 10(b) claims with the specificity required by Rule 9 of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act (the PSLRA).

To state a claim under Rule 10b-5 for securities fraud, the Tenth Circuit has held that a plaintiff's complaint must contain allegations that

> (1) the defendant made an untrue or misleading statement of material fact, or
> failed to state a material fact necessary to make statements not misleading; (2) the

16

statement complained of was made in connection with the purchase or sale of securities; (3) the defendant acted with scienter, that is, with intent to defraud or recklessness; (4) the plaintiff relied on the misleading statements; and (5) the plaintiff suffered damages as a result of his reliance.

<u>Adams</u>, 340 F.3d at 1095.  "A plaintiff suing under [§] 10(b) ... bears a heavy burden at the pleading stage."  <u>In re Level 3 Commc'ns, Inc. Sec. Litig.</u>, 667 F.3d 1331, 1333 (10th Cir. 2012).

Securities fraud plaintiffs must meet the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure.  <u>Adams</u>, 340 F.3d at 1095 (citing <u>City of Phila. v. Fleming Cos., Inc.</u>, 264 F.3d 1245, 1258 (10th Cir. 2001)).  Rule 9(b) provides that plaintiffs alleging fraud or mistake "must state <u>with particularity</u> the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b) (emphasis added).  Plaintiffs must "set forth what is false or misleading about a statement, and why it is false.  In other words, the plaintiff[s] must set forth an explanation as to why the statement or omission complained of was false or misleading."  <u>Grossman v. Novell, Inc.</u>, 120 F.3d 1112, 1124 (10th Cir. 1997).  The Tenth Circuit has further explained that plaintiffs must "set forth the time, place, and contents of the false representation, the identity of the party making the false statements and the consequences thereof."  <u>Jensen v. Am.'s Wholesale Lender</u>, 425 F. App'x 761, 763 (10th Cir. 2011).

Moreover, Congress heightened the pleading standard for federal securities fraud claims with the passage of the PSLRA in 1995.  <u>Adams</u>, 340 F.3d at 1095.  The "PSLRA did not add to the list of the five elements that make up the [Section 10(b)] cause of action; instead, it strengthened what is required adequately to plead two of those elements[:]" the circumstances of fraud and scienter (the first and third elements).  <u>Id.</u>

The Defendants argue that the Plaintiffs have failed to plead these two elements

adequately.[7]  But although the Plaintiffs are subject to the PSLRA's heightened pleading standards, "[t]he issue in resolving a motion such as this is not whether the plaintiff will ultimately prevail, but whether he or she is entitled to offer evidence to support the claims."  In re Sprint Corp. Sec. Litig., 232 F. Supp. 2d 1193, 1213 (D. Kan. 2002).

### A.  Circumstances of Fraud

The PSLRA requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  Adams, 340 F.3d at 1095 (quoting 15 U.S.C. § 78u-4(b)(1)).  In pleadings based on information and belief, plaintiffs need not plead "every single fact upon which their beliefs concerning false or misleading statements are based."  Id. at 1098–99.  But "[g]eneralized or conclusory allegations of fraud will not be sufficient."  Id. at 1098.  Rather, courts construing complaints based upon information and belief "determine whether, taken as a whole, they support a reasonable belief that the defendant's statements identified by the plaintiff were false or misleading."  Id. at 1099.  This determination involves an evaluation of the following:

> (1) the level of detail provided by the facts stated in a complaint; (2) the number of facts provided; (3) the coherence and plausibility of the facts when considered together; (4) whether the source of the plaintiff's knowledge about a stated fact is disclosed; (5) the reliability of the sources from which the facts were obtained; and (6) any other indicia of how strongly the facts support the conclusion that a reasonable person would believe that the defendant's statements were misleading.

---

[7] The parties dispute whether the Plaintiffs' Complaint can be dismissed for failure to plead with particularity under Rule 9(b) of the Federal Rules of Civil Procedure alone.  (See ECF No. 28 at 4–8; see also Reply, ECF No. 30 at 2–3).  The court need not address this dispute.  See Adams, 340 F.3d at 1095–98 (analyzing the plaintiffs' allegations under the PSLRA without first reviewing the allegations under Rule 9(b) of the Federal Rules of Civil Procedure and explaining that "[p]rior to [the] passage of the PSLRA," Rule 9(b) "set the standard for the level of particularity required" in securities fraud actions).

Id.  The Tenth Circuit has rejected the assertion that plaintiffs must disclose the sources from which they obtained knowledge of the facts they are alleging.  Id. at 1100.

In Adams, "[t]he basis for the lawsuit [was] the plaintiffs' allegations that the defendants made misleading statements about [integrated natural gas company] Kinder Morgan's profitability during" the relevant period.  Id. at 1087.  According to the complaint, the defendants maintained that a key business of Kinder-Morgan (a gas processing complex called Bushton) was profitable even though it was losing money; the complaint also alleged that the defendants violated Generally Accepted Accounting Principles (GAAP) and company policy to inflate net income.  Id.  The defendants allegedly engaged in these actions "to sell securities at favorable prices to finance an acquisition and to facilitate completion of a merger."  Id.

The Tenth Circuit held that the plaintiffs' complaint adequately stated the allegedly misleading statements and the reasons why the statements were claimed to be misleading.  Id. at 1096.  The complaint stated that Bushton was unprofitable because of lease payments Kinder-Morgan was making on the Plant and contracts Kinder-Morgan had with customers that were losing money.  Id. at 1096–97.  The complaint also explained that Kinder-Morgan included income in the accounting documents that should not have been recorded.  Id. at 1097.

Although the Tenth Circuit construed the plaintiffs' complaint as one based largely on information and belief, it held that the facts alleged in the complaint supported a reasonable belief that Kinder-Morgan made statements that were false and misleading.  Id. at 1097, 1103.  The Tenth Circuit found two separate sets of facts helpful.  Id. at 1103.  "The first set of facts showed that Bushton was, in fact, unprofitable."  Id. at 1103 (identifying the following sources: an analysis of Bushton, a report in industry publication, and statements made by an individual affiliated with Bushton).  "The second set of facts supporting the allegation that Bushton was

unprofitable [was] the detailed explanation in the complaint of <u>why</u> Bushton was unprofitable."
<u>Id.</u> (pointing to the plaintiffs' allegations that large lease payments on Bushton and unfavorable market conditions caused Bushton to lose money). Importantly, "[f]ar from resting on conclusory assertions about the state of the Bushton operation, the plaintiffs have articulated a plausible explanation for their allegations, based on objectively verifiable market data," among other sources. <u>Id.</u> at 1103–04. Allegations that "may be objectively verifiable by the defendant without the necessity of the plaintiff divulging how he or she acquired such information" included "the financial result of a transaction[.]" <u>Id.</u> at 1102.

Here, the Plaintiffs have identified two groups of allegedly false or misleading statements made by Mr. Cooper and Mr. Yates that the Plaintiffs claim induced them to purchase NewAge stock. First, the Plaintiffs point to these Defendants' statements about ICONN:

> In or around January 2020, T Painter was informed by Cooper and Yates that ARIIX employees were developing a technology to update ARIIX's Customer Relationship Management ("CRM") database and payment system. T Painter was eager to learn more about the CRM system, which he was told was ARIIX's new, highly confidential, proprietary and innovative software to track sales and commissions more accurately and effectively, and which would be known as ICONN.

> T Painter was told that ICONN was a software owned solely by ARIIX and developed by ARIIX's personnel at ARIIX's expense, and that ICONN had been designed to give ARIIX a competitive advantage in the marketplace and to assist and incentive [sic] Brand Partners and new marketing recruits, which would expand ARIIX's ongoing growth.

> …

> Cooper and Yates represented that Cooper … had been and [was] integrally involved in the development of ICONN and that Cooper was an MLM compensation genius[.]… ICONN would be used exclusively by ARIIX to capitalize on evolving marketing advantages[.]… T Painter understood ARIIX would greatly benefit from Cooper's exclusive provision of the ICONN design, development and commercialization services.

(Compl. at ¶¶ 73–77.)

The Plaintiffs then explain why the statements about the ICONN software are false or misleading.  They allege that

> the individual Defendants, including specifically Cooper, had already begun an undisclosed disclosure of information pertaining to and transfer of the ICONN software to a competing company, later learned to be Kwikclick, … which had been formed by some or all of the Defendants in February 2020.
>
> …
>
> Upon information and belief, in or around June 2020, without either disclosure to or informing or getting permission from NewAge or ARIIX shareholders, Cooper directed ARIIX to transfer a copy of the source code for ICONN to [Kwikclick.]

(Id. ¶¶ 78, 86.)

Next, the Plaintiffs allege that the Defendants made false or misleading statements about the merger and ARIIX's value.  On July 20, 2020, after NewAge formally announced it entered an agreement with ARIIX, "Cooper[] published a YouTube Live Broadcast, in which he stated that NewAge, as combined with ARIIX, would gross over $600 Million in sales."  (Id. ¶ 93.) Then,

> Defendants Cooper and Yates, on behalf of the Defendants and ARIIX, made the following representations to Plaintiffs, among others, in an effort to gain the ARIIX shareholder approval for the merger:
>
> a.  After the merger, NewAge will make an additional $20 Million in annualized earnings before interest, taxes, depreciation or amortization.
> b.  After the merger, NewAge will buy products at a discount not previously available.
> c.  Cooper would be the Chairman of the Board of NewAge after the merger.
> d.  ARIIX's fair valuation for purposes of the merger will be $220,000,000.00.
>
> In connection therewith, Cooper and Yates represented to T Painter that ARIIX had more than $11 Million in working capital on hand.
>
> …
>
> Defendants Cooper and Yates also represented to T Painter that ARIIX would merge at a price of between $5.50 and $6.00 per share[.]

21

(Id. ¶¶ 94–95, 103.)

> The Plaintiffs then explain why these statements are false or misleading:
>
> Defendants had no realistic plan in place or viable method to make an additional $20 Million in annualized earnings before interest, taxes, depreciation and/or amortization.
>
> Defendants knew that NewAge would not be able to buy products at a discount not previously available.
>
> Cooper never planned to become Chairman of the Board at NewAge, and never did become such.
>
> ARIIX did not have working capital of $11 Million, but instead was undercapitalized by $18 Million.
>
> Cooper had already unlawfully and without disclosure or approval transferred the source code for the ICONN software to his competing business, Kwikclick.
>
> …
>
> Cooper instructed Tyler Jones, formerly of ARIIX and NewAge's Vice President of Legal, to draft and backdate a sham agreement between ARIIX and Kwikclick regarding the ICONN source code.  No such agreement was disclosed prior to or as part of the merger.

(Id. ¶¶ 98–102, 111.)  Importantly, according to the Plaintiffs, on the day of the merger, "NewAge stock … traded at $1.74 per share" rather than at a value between $5.50 and $6.00 per share.  (Id. ¶ 103.)  "ARIIX's valuation upon merger was [also] only $69,010,140" instead of $220,000,000.  (Id. ¶¶ 94, 104.)

While some of the Plaintiffs' allegations are based upon information and belief, the Complaint in its entirety supports a reasonable belief that the above-identified statements and omissions were false or misleading.  See Adams, 340 F.3d at 1099.  Considered together, the facts tell a plausible story: Mr. Cooper, Mr. Yates, and at times Mr. Wilson, induced the Plaintiffs to invest in NewAge post-merger by claiming that ARIIX was developing proprietary

software and by making inflated representations about ARIIX's value at the time of merger.  But in reality, these Defendants had founded a different company, licensed the proprietary software to that company, and planned to use the additional resources provided by the merger to benefit that company.

There are also enough facts alleged to support a reasonable belief that the optimistic statements about the merger and ARIIX's value leading up to the merger were false or misleading.  Where a securities fraud plaintiff alleges "'hard' financial information regarding corporate performance" instead of "forward-looking predictions or opinions[,]" to show that statements made were false or misleading, courts are more likely to find that the plaintiff alleged an actionable Section 10(b) claim.  In re Sprint, 232 F. Supp. 2d at 1214.  Here, ARIIX's valuation at merger was $69,010,140, not $220,000,000.  (Compl. at ¶¶ 104–05.)  Mr. Painter only received 1,437,176 shares, valued at $1.74 per share for a total of $2,500,686, instead of receiving shares worth $7,700,000.  (Id. ¶ 105.)  In response to Mr. Painter's skepticism, Defendants "Cooper, Wilson, and/or Yates told T Painter there was nothing to worry about and represented that NewAge stock would quickly reach $20 per share in the near future[.]"  (Id. ¶ 107.)  After the merger, "Yates [also] represented to T Painter that an additional 157,208 shares of NewAge would be issued to RTM, however, such was never issued as represented."  (Id. ¶ 106.)

Finally, the Plaintiffs allege that the individual Defendants "possessed motives to engage in fraud[.]"  Adams, 340 F.3d at 1104.  While "[t]his is the type of factual allegation that would be bolstered if the [P]laintiffs could disclose a reliable source which one might expect to have knowledge of the [D]efendants' actual motives," id., the court accepts as true the Plaintiffs' allegations about Kwikclick (Compl. at ¶¶ 78, 84) and draws all inferences arising from well-

pled allegations in the Plaintiffs' favor at this stage in the litigation.  The individual Defendants founded Kwikclick in February 2020, around the same time "ARIIX approached NewAge regarding a potential business combination."  (Id. ¶ 80.)  "Several of the Defendants, including Cooper, Wilson, and Yates thereafter affiliated with Kwikclick as officers and/or employees." (Id. ¶ 84.)  From the Plaintiffs' Complaint in its entirety, the court can infer why the merger was necessary: ARIIX merged with NewAge to give the individual Defendants access to more resources and opportunities to benefit Kwikclick—to NewAge's detriment.  (See id. ¶¶ 46, 49, 69, 72, 119–20.)

The Defendants take issue with the lack of sources given in the Plaintiffs' Complaint. (See ECF No. 30 at 7.)  But the Tenth Circuit has rejected the assertion that plaintiffs must disclose the sources from which they obtained knowledge of the facts they are alleging.  Adams, 340 F.3d at 1101.  Even so, the source of many of the facts alleged is Mr. Painter, an ARIIX (and, later, NewAge) investor who failed to receive the investment value for the Plaintiffs that he had expected based on the individual Defendants' representations.

In sum, Plaintiffs "have articulated a plausible explanation for their allegations …." Adams, 340 F.3d at 1104.  The allegations amount to more than "conclusory allegations" of fraud, id. at 1098, or "blanket statements of wrongdoing[.]"  In re AOL Time Warner, Inc. Sec. & "ERISA" Litig., 381 F. Supp. 2d 192, 238 (S.D.N.Y. 2004) (citation omitted).  Indeed, the facts alleged "giv[e] rise to … inference[s] regarding the falsity of the information given[.]"  In re Rhythms Sec. Litig., 300 F. Supp. 2d 1081, 1088 (D. Colo. 2004).  Considering the Plaintiffs' numerous allegations as a whole, their level of detail, the coherence and plausibility of the facts when reviewed together, and the source who provided the information (Mr. Painter), the court finds that the allegations support a "reasonable belief that the [D]efendant[s'] statements" and

omissions were false or misleading.  <u>Adams</u>, 340 F.3d at 1099.  The Plaintiffs have adequately

put the Defendants on notice of the substance of the Plaintiffs' Section 10(b) claims.

### B.  Scienter

The PSLRA also requires securities fraud plaintiffs to "state with particularity facts

giving rise to a strong inference that [each] defendant acted with the required state of mind" and

must do so for each act or omission alleged to be a violation of the securities laws.  15 U.S.C.

§ 78u-4(b)(2)(A).  In the Tenth Circuit, securities fraud plaintiffs must plead facts "giving rise to

a strong inference that Defendants intentionally or recklessly" made misrepresentations or

omissions alleged to be a violation of the securities laws.  <u>Fleming</u>, 264 F.3d at 1249.  "When

reviewing a plaintiff's allegations of scienter under the PSLRA, a court should … examine the

plaintiff's allegations in their entirety … and determine whether the plaintiff's allegations, taken

as a whole, give rise to a strong inference of scienter."  <u>Id.</u> at 1263.  "[A]llegations of motive and

opportunity … without more[]" do not give rise to a strong inference of scienter, <u>id.</u> at 1249, but

they "may be important to th[e] totality [inquiry.]"  <u>Id.</u> at 1262.  Similarly, allegations that a

defendant holds a senior position in management, without more, do not show that he or she

possessed the requisite scienter.  <u>See id.</u> at 1264.  But the fact that a defendant "was the most

senior executive" can be relevant.  <u>Adams</u>, 340 F.3d at 1106.

The court first considers the allegations of scienter against Mr. Cooper, Mr. Yates, and

Mr. Wilson.  The Plaintiffs allege that Mr. Cooper and Mr. Yates made the challenged

statements and omissions about ICONN and ARIIX's value at the time of merger.  (Compl. at ¶¶

73–79, 94, 103–04.)  In response to Mr. Painter's skepticism about the individual Defendants,

"Cooper, Wilson and/or Yates told T Painter there was nothing to worry about and represented

that NewAge stock would quickly reach $20 per share in the near future, as Yates had previously

represented[.]"  (Id. ¶ 107.)  Mr. Cooper, Mr. Yates, and Mr. Wilson all held officer positions at

ARIIX and, upon information and belief, at NewAge.  (Id. ¶¶ 21, 113–17.)  Mr. Cooper was

ARIIX's CEO during the relevant period, and, upon information and belief, became an owner

and served as a director at NewAge.  (Id. ¶¶ 8, 113.)  Mr. Yates was ARIIX's CFO and, upon

information and belief, Executive Vice President at NewAge after the merger.  (Id. ¶¶ 7, 115.)

And Mr. Wilson was President of ARIIX and, upon information and belief, President of NewAge

post-merger.  (Id. ¶¶ 10, 114.)  After Mr. Cooper "caused Kwikclick to be organized in the State

of Utah[]" on or around February 20, 2020, the Plaintiffs allege that "[s]everal of the Defendants,

including Cooper, Wilson and Yates, thereafter affiliated with Kwikclick as officers and/or

employees."  (Id. ¶ 84.)

        The positions held by Mr. Cooper, Mr. Yates, and Mr. Wilson at ARIIX and NewAge, in

conjunction with the other allegations, give rise to a strong inference of scienter.  See Adams,

340 F.3d at 1106 (holding that the CEO and CFO of a company could have scienter to defraud

because they held these positions in conjunction with other alleged facts).  Because of their

affiliation with Kwikclick, these individual Defendants had a motive, and the opportunity, to

commit fraud.  Fleming, 264 F.3d at 1262.  The motive and opportunity alleged go beyond

"generalized allegations of a desire to achieve favorable terms in a merger or acquisition[.]"  In

re JP Morgan Chase Sec. Litig., 363 F. Supp. 2d 595, 620 (S.D.N.Y. 2005).  The Plaintiffs have

instead asserted "a concrete and personal benefit to the[se] individual defendants resulting from

the fraud."  Id. at 619 (quoting Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001)).  Specifically,

Mr. Cooper, Mr. Yates, and Mr. Wilson stood to gain financially.  The Plaintiffs' purchases of

NewAge shares benefitted NewAge post-merger but thereafter allowed these Defendants to

enrich Kwikclick to NewAge's detriment.  The Plaintiffs' allegations "establish a strong

inference that [the] Defendants knew" the facts concerning Kwikclick were material and that ARIIX investors would be misled if those facts were not disclosed. <u>Fleming</u>, 264 F.3d at 1264. At a minimum, by not disclosing this information, these three Defendants engaged in "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care …." <u>Id.</u> at 1265 (citation omitted). "[A] reasonable person [would] deem the inference of scienter [here] at least as strong as any opposing inference[.]" <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 326 (2007).

Moreover, Mr. Cooper, Mr. Yates, and Mr. Wilson plausibly had knowledge "of the facts or access to information contradicting their public statements[.]" <u>In re Bristol-Myers Squibb Co. Sec. Litig.</u>, 312 F. Supp. 2d 549, 562 (S.D.N.Y. 2004). "After the merger and in a further meeting with T Painter, in which T Painter expressed his utter lack of understanding and still growing skepticism, Cooper, Wilson, and/or Yates told T Painter there was nothing to worry about and represented that NewAge stock would quickly reach $20 per share in the near future[.]" (Compl. at ¶ 107.)

The Defendants note that the Plaintiffs have not alleged that any of the individual Defendants sold Mr. Painter shares of NewAge stock. They argue that therefore the court may not find a strong inference of scienter, citing the Ninth Circuit's decision in <u>Metzler Inv. GMBH v. Corinthian Colls., Inc.</u>, 540 F.3d 1049, 1067 (9th Cir. 2008). The Ninth Circuit held that where none of the defendants were alleged to have sold stock in connection with allegedly fraudulent statements, "[t]he allegations do not support an inference of scienter." <u>Id.</u>  But in <u>Metzler</u>, "[t]he insider trading alleged" failed to raise a strong inference of scienter because the "suspicious stock sales" at issue were not out of line with prior trading practices. <u>Id.</u> at 1067 (citation omitted). The court found that the two defendants "were simply trading in line with

prior patterns[,]" and one defendant sold nothing at all, which "suggest[ed] that there was no insider information from which to benefit[.]"  Id.  Here, the totality of the circumstances suggests that the individual Defendants acted intentionally or recklessly, even if none of the Defendants sold the NewAge stock.

For the above reasons, the court finds that the Plaintiffs' allegations have given rise to a strong inference that Mr. Cooper, Mr. Yates, and Mr. Wilson acted with the required scienter. And because the Complaint adequately alleges that these individual Defendants had the requisite scienter, the court may attribute scienter to Cooper Family Investments, LP; Yates Family Investments, LTD; and Wilson Family Holdings, LLC.  See Adams, 340 F.3d at 1106 ("The scienter of the senior … officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of § 10(b) ….").

But the Plaintiffs have not alleged that either Mr. Chandler or Mr. Timmer made false or misleading statements that induced the Plaintiffs to purchase NewAge stock.  (See ECF Nos. 19 & 20 at 3–4; see generally Compl. at ¶¶ 73–134.)  And while the Plaintiffs have alleged that all individual Defendants made material omissions about ARIIX, it is not clear from the Complaint whether Mr. Chandler or Mr. Timmer were ever involved with Kwikclick.  (See, e.g., Compl. at ¶ 84 (not specifying Mr. Chandler or Mr. Timmer when alleging that several Defendants, "including Cooper, Wilson and Yates, thereafter affiliated with Kwikclick as officers and/or employees").)  The Plaintiffs merely allege that Mr. Chandler was ARIIX's Vice President and Mr. Timmer was ARIIX's COO during the relevant times and that, "[u]pon information and belief, after the merger with NewAge, Chandler served as Greater China President … [and] Timmer served as Global Head of Investor Relations."  (Id. ¶¶ 9, 11, 116–17.)  Mr. Chandler's and Mr. Timmer's positions alone do not support a strong inference of scienter, see Adams, 340

F.3d at 1106 (holding that senior executive positions alone do not give rise to a strong inference

of scienter) (citation omitted), and the Plaintiffs have failed to allege any other facts that give rise

to a strong inference of scienter for these Defendants.  The court grants the Plaintiffs leave to

amend their scienter allegations against Mr. Timmer and Mr. Chandler.

### III.     Loss Causation

The Defendants assert that, even if the Plaintiffs have adequately pled the other the

elements of their Section 10(b) claims, they have nevertheless failed to plead loss causation.

(ECF No. 18 at 18–20.)  The Defendants maintain that it would be futile to grant leave for the

Plaintiffs to amend: "Even if granted leave to amend, Plaintiffs will be unable to demonstrate

that the loss in NewAge share price was not caused by the market, industry, and company-

specific factors stated by NewAge in its bankruptcy."  (Id. at 19.)  The court agrees that the

Plaintiffs have failed to plead loss causation but disagrees that granting leave to amend would be

futile.

When pursuing private securities fraud actions under Section 10(b), plaintiffs must prove

"(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection

between the misrepresentation or omission and the purchase or sale of a security; (4) reliance

upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  Stoneridge,

552 U.S. at 157 (emphasis added).  Loss causation "is the causal link between the alleged

misconduct and the economic harm ultimately suffered by the plaintiff."  In re Williams Sec.

Litig.-WCG Subclass, 558 F.3d 1130, 1136 (10th Cir. 2009) (citation omitted).

In Dura Pharmaceuticals, Inc. v. Broudo, the Supreme Court overturned a Ninth Circuit

decision holding that a securities fraud plaintiff may adequately plead loss causation by alleging

only that the price of the security on the date of purchase was inflated due to a defendant's

misrepresentations or omissions.  544 U.S. 336, 338 (2005).  Instead, the Court found that a

"higher purchase price will <u>sometimes</u> play a role in bringing about a future loss" but that the

relevant statute "makes clear Congress' intent to permit private securities fraud actions for

recovery where, but only where, plaintiffs adequately allege and prove the traditional elements of

causation …."  <u>Id.</u> at 343, 346.  The Court then applied ordinary pleading standards to assess

whether the plaintiffs had adequately pled proximate causation and economic loss.  <u>See id.</u> at 346

(explaining that the plaintiffs must "provide[] the defendants with notice of what … the causal

connection might be between that loss and the misrepresentation[s]" related to the loss).

In cases involving the purchase of stock at inflated prices, a plaintiff must therefore show

there was a causal connection between the loss and the misrepresentation and that the plaintiff's

losses "were attributable to the revelation of the fraud and not the myriad other factors that affect

a company's stock price."  <u>In re Williams</u>, 558 F.3d at 1137; <u>see Nakkhumpun v. Taylor</u>, 782

F.3d 1142, 1154 (10th Cir. 2015) ("To plead loss causation, a plaintiff must allege facts showing

a causal connection between the revelation of truth to the marketplace and losses sustained by

the plaintiff.").  "Even if the truth has made its way into the marketplace, <u>Dura</u> requires that a

plaintiff show that it was this revelation that caused the loss and not one of the 'tangle of factors'

that affect price."  <u>In re Williams</u>, 558 F.3d at 1137 (quoting <u>Dura</u>, 544 U.S. at 343).

> Loss causation can be shown through (1) 'a corrective disclosure' which 'reveals
> fraud to the public'; (2) a 'leakage theory' in which 'the relevant truth … leak[s]
> out' bit by bit[,] … or (3) 'a theory of materialization of a concealed risk' in
> which 'a plaintiff … show[s] that the defendant's misrepresentation concealed a
> risk that caused a loss for the plaintiff when the risk materialized[.]'

<u>Kessman v. Myried Genetics, Inc.</u>, No. 2:18-cv-336, 2019 WL 1330363, at *9 (D. Utah Mar. 25,

2019) (quoting <u>Nakkhumpun</u>, 782 F.3d at 1154).  "Regardless of which method the [plaintiffs]

employ[], they must establish 'how [and when] the truth was revealed.'"  <u>Id.</u> (quoting <u>In re</u>

<u>SandRidge Energy, Inc. Sec. Litig.</u>, No. civ-12-1341, 2017 WL 3309758, at *14 (W.D. Okla. Aug. 1, 2017)).

But the examples cited above concern the "paradigmatic case involving a public issuer's falsely positive statement(s) or nondisclosure of negative information …." <u>Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.</u>, 663 F. Supp. 3d 334, 364 (S.D.N.Y. 2023). The methodology used to evaluate the alleged cause of a plaintiff's loss in these cases does not necessarily apply where a plaintiff's loss is attributable to a merger or other fraudulent actions. In merger cases, courts have been willing to consider a "theory of transaction causation—that, but for the actionable misstatements and omissions, the shareholder approval and ensuing exchange of outstanding shares … would have not occurred." <u>Id.</u> at 365.

From the Complaint, the court discerns at least three potential ways in which the Plaintiffs allege that they suffered loss—but each theory raises questions about causation. First, the Plaintiffs suggest that the Defendants made misrepresentations about the ICONN software (<u>see</u> Compl. at ¶¶ 73–79), and—from this,—the court can infer that the Plaintiffs purchased additional shares of NewAge stock under the belief that NewAge would have exclusive ownership of that software after acquiring ARIIX's assets in the merger. But it is unclear from the Complaint whether any information about ICONN was ever publicly available, whether false beliefs about ARIIX's or NewAge's ownership of this software resulted in a higher price for NewAge shares, and whether a subsequent revelation that the software had been licensed to Kwikclick caused a drop in share price.

Second, the Plaintiffs allege loss through the merger process itself (<u>see, e.g.</u>, <u>id.</u> ¶ 105)— namely, that although they had invested $3,281,800 in ARIIX, they received NewAge shares worth only $2,500,686 as a result of the merger. (<u>Id.</u>) But the Plaintiffs omit specific

information about the merger process that would allow the court to infer that the merger would not have occurred but for the Defendants' misrepresentations about ARIIX's working capital and its current valuation, its ownership of the ICONN software, and the Defendant's overly optimistic assessment of NewAge's earnings post-merger.  For instance, there are no allegations suggesting that the Plaintiffs voted to approve the merger.[8]  And the Plaintiffs have not explained how they could have obtained more value from their 3.5% interest in ARIIX if the merger had not occurred.  Courts have "not looked kindly on similarly attenuated theories of economic loss when articulated in securities fraud lawsuits."  <u>Altimeo</u>, 663 F. Supp. 3d at 368 (listing case examples).

Finally, the Plaintiffs allege that the Defendants committed fraudulent acts by using ARIIX and NewAge resources to benefit Kwikclick.  Most importantly, the Plaintiffs assert that NewAge supported Kwikclick's development at a cost of $200,000 per month (Compl. at ¶ 119) and later signed a licensing agreement with Kwikclick that required NewAge to pay a licensing fee of $50,000 per month, as well as "substantial commissions" to Kwikclick.  (<u>Id.</u> ¶¶ 120, 123.)  As discussed above, the Plaintiffs have primarily focused their Complaint on the Defendants' misrepresentations and omissions, arguing that these statements were a violation of Rule 10b-5(b).  But even if the court construed the Complaint to assert a violation of Rule 10b-5(a) or 10b-5(c), the Plaintiffs have failed to connect the Defendants' alleged fraudulent conduct with NewAge's subsequent bankruptcy.  Indeed, citing proceedings in the bankruptcy case, the Defendants argue that the Plaintiffs should not be granted leave to amend their Complaint because they will be unable to demonstrate that NewAge's bankruptcy was not simply the result

---

[8] The Plaintiffs allege that the Defendants made an "effort to gain the ARIIX shareholder approval for the merger[.]"  (<u>Id.</u> ¶ 94.)  But it is unclear whether the Plaintiffs—who purchased a 3.5% interest in ARIIX under various Economic Interest Transfer Agreements (<u>see id.</u> ¶¶ 41, 53, 64)—were ARIIX shareholders who voted for the merger.

of market, industry, or company-specific factors.[9]

The court disagrees that the Plaintiffs' claim is as implausible as the Defendants suggest. For example, NewAge's liquidity crisis may well have been proximately caused by excessive payments to Kwikclick.  But due to the lack of any allegations about the subsequent bankruptcy and the connection to the Defendants' alleged fraud, the court cannot make that inference on these facts.

Accordingly, the court finds that the Plaintiffs have not adequately pled that the Defendants' actions and misrepresentations proximately caused the Plaintiffs' loss.  But the court also finds that the Plaintiffs may be able to demonstrate this connection.  To survive a motion to dismiss, the Plaintiffs need only allege enough facts that state a claim to relief that is plausible on its face.  Accordingly, the court gives the Plaintiffs leave to amend their loss causation allegations.

## IV.  Control Liability Claim

The Defendants argue that the Plaintiffs have failed to plead their control liability claim, asserted under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

Section 20(a) reads:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person … is

---

[9] Both parties request that the court take judicial notice of facts asserted on the record in NewAge bankruptcy proceedings.  (See ECF No. 18 at 19; see also ECF No. 28 at 22.)  On a Rule 12(b)(6) motion to dismiss, the court may consider "facts subject to judicial notice … without converting the motion to dismiss into a motion for summary judgment."  Tal v. Hogan, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006) (citation omitted).  "This allows the court to take judicial notice of its own files and records, as well as facts which are a matter of public record."  Id. (citation omitted).  But "'[t]he documents may only be considered to show their contents, not to prove the truth of the matters asserted therein.'"  Id. (quoting Oxford Asset Mgmt., Ltd. v. Jaharis, 297 F.3d 1182, 1188 (11th Cir. 2002)).  Accordingly, while the court may take judicial notice of the facts from the bankruptcy proceedings, the court does not find these facts are dispositive.

liable, … unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  The Tenth Circuit has explained that to show a prima facie case of control person liability, "the plaintiff must establish (1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person."  Adams, 340 F.3d at 1107. To make their second showing, plaintiffs must plead facts indicating that defendants "had possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."  Id. at 1108 (citation omitted).

Given their deficient loss causation allegations, the Plaintiffs have failed to state a Section 10(b) claim against any Defendant.  And without adequately alleging a primary violation of the securities laws, the Plaintiffs have also failed to state a Section 20(a) claim against the Defendants.  But because the Plaintiffs have leave to amend their Section 10(b) claims, they may also amend their Section 20(a) claims.

**V.     Section 12(a)(2) Claims**

Finally, the Defendants contend that the Plaintiffs have not stated their Section 12(a)(2) claims because 15 U.S.C. § 77l(a)(2) does not provide a private right of action.  This is an incorrect statement.  The statute does provide a private right of action, but it is unclear whether the Plaintiffs may rely on it in this action.

In Gustafson v. Alloyd Co., Inc., the Supreme Court explained that under § 12(a)(2) of the Securities Act of 1933, "buyers have an express cause of action for rescission against sellers who make material misstatements or omissions by means of a prospectus."  513 U.S. 561, 564 (1995) (citation omitted and emphasis added).  The question at issue was whether "this right of rescission extends to a private, secondary transaction, on the theory that recitations in the

purchase agreement are part of a 'prospectus.'"  Id.  The Court held that the right of rescission did not and that a prospectus under § 12, like § 10, was "confined to documents related to public offerings by an issuer or its controlling shareholders."  Id. at 569.  Because "the contract of sale, and its recitations, were not held out to the public and were not a prospectus as the term is used in the 1933 Act[,]" the plaintiff-buyer did not have a cause of action under Section 12(a)(2) of the Securities Act.  See id. at 584.

Under Gustafson, there are two problems with the Plaintiffs' Section 12(a)(2) claims. The first is that the Plaintiffs have not alleged that they bought their NewAge shares from the individual Defendants.  (Compl. at ¶¶ 96, 109.)  It is not clear that these Defendants were "sellers" as the term is used in Section 12(a)(2).  See Gustafson, 513 U.S. at 564.  The second issue is that the Plaintiffs have not adequately alleged that the challenged statements were made by means of a prospectus or an oral communication related to such prospectus.  See id. at 567.

The Plaintiffs explain that "[t]he Defendants offered securities by soliciting Plaintiffs to purchase … NewAge stock" and that "[t]he individual Defendants' oral misrepresentations also directly and/or indirectly related to NewAge's prospectus."  (ECF No. 28 at 16.)  The Plaintiffs also write that the individual Defendants' "misrepresentations referenced the various features of Plaintiffs' NewAge securities purchases, including the availability of … outstanding stock on the public market, … product superiority, and more importantly, the diminished risk of purchasing such at that time, each of which were topics referenced in NewAge's prospectus."  (Id.)  Finally, the Plaintiffs maintain that the challenged statements were made by means of oral communications related to NewAge's prospectus.  (Id.)  Accordingly, the court finds that it would not be futile to grant the Plaintiffs leave to amend these claims.

VI.    **State Law Claims**

Because the Plaintiffs have failed to state any federal claims, and because the parties have

not briefed whether the Plaintiffs have adequately pled their state law claims,[10] the court makes

no ruling about whether those claims are adequately pled.  Instead, the court dismisses the state

law claims with leave to amend.

## ORDER

For the foregoing reasons, the court ORDERS as follows:

1.    The court GRANTS the Defendants' motions to dismiss (ECF Nos. 18, 19 & 20).

2.    The Plaintiffs' claims are DISMISSED WITHOUT PREJUDICE, except that any

claims arising from allegations predating October 13, 2018, are DISMISSED WITH

PREJUDICE.

3.    The court grants the Plaintiffs leave to amend.  Any amended complaint must be

filed within 30 days from the date of this order.

DATED this 25th day of July, 2024

BY THE COURT:

_Tena Campbell_

TENA CAMPBELL
United States District Judge

---

[10] The Defendants argue only that because the Plaintiffs have failed to state any federal claims, the court should decline to exercise supplemental jurisdiction over the state law claims.  (ECF No. 18 at 20.)