IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| RYCAR TRUST; RTM5 TRUST; RYAN THOMAS MANAGEMENT COMPANY, <br><br> Plaintiffs, <br><br> vs. <br><br> YATES FAMILY INVESTMENTS fka YATES FAMILY INVESTMENTS LTD; JEFFREY YATES; COOPER FAMILY INVESTMENTS; FRED COOPER; CHANDLER FAMILY INVESTMENTS; IAN CHANDLER; WILSON FAMILY HOLDINGS; MARK WILSON; TIMMER FAMILY INVESTMENTS fka TIMMER FAMILY INVESTMENTS, LTD; RILEY TIMMER <br><br> Defendants. | **ORDER AND MEMORANDUM DECISION GRANTING MOTION TO DISMISS** <br><br> Case No. 2:23-CV-00732-TC-DAO <br><br> Judge Tena Campbell <br> Magistrate Judge Daphne A. Oberg |

This is a securities fraud lawsuit brought by Plaintiffs Rycar Trust, RTM5 Trust, and Ryan

Thomas Management Company LLC (collectively, Plaintiffs) against Defendants Jeffrey Yates;

Fred Cooper; Ian Chandler; Mark Wilson; and Riley Timmer, individually and on behalf of the

Yates Family Investments (Yates Investments); Cooper Family Investments (Cooper

Investments); Chandler Family Investments (Chandler Investments); Wilson Family Holdings,

(Wilson Holdings); and Timmer Family Investments (Timmer Investments).  The Plaintiffs

allege that the Defendants' misrepresentations, non-disclosures, and actions caused the Plaintiffs to purchase and hold onto shares of ARIIX LLC (ARIIX) and NewAge, Inc. (NewAge), worth over $10,000,000 and that, as a result, the Plaintiffs suffered losses of at least $17 million.  (Am. Compl., ECF No. 36 at ¶¶ 1, 259.)

Before the court is the Defendants' motion to dismiss.  (ECF No. 37.)  Based on the applicable statute of limitations and the Plaintiffs' failure to adequately plead loss causation, the court grants the Defendants' motion to dismiss with prejudice.

## FACTUAL ALLEGATIONS[1]

In 2011, the individual Defendants founded ARIIX, a multi-level marketing (MLM) e-commerce company.  (Am. Compl. at ¶¶ 19–21.)  Mr. Cooper was ARIIX's Chief Executive Officer (CEO), Mr. Yates was the Chief Financial Officer (CFO), Mr. Wilson was the President, Mr. Chandler was the Vice President, and Mr. Timmer was the Chief Operating Officer (COO).  (Id. ¶ 21.)  Through their positions at ARIIX, the individual Defendants met Thomas and LaDawn Painter, the trustees of and representatives for Plaintiffs Rycar Trust and the RTM5 Trust.  (Id. ¶¶ 5, 6, 22–25.)

Between January 2015 and April 2017, Mr. Painter, on behalf of the Rycar and RTM5 Trusts, invested $3,281,800 in ARIIX.  (See id. ¶¶ 41, 53, 64, 67.)  Consistent with the five-year statute of repose, the court has already dismissed any securities fraud allegations relating to these investments.  (Order Granting Mot. Dismiss dated July 25, 2024, ECF No. 35 at 16.)  The court nonetheless details these investments as context for the Plaintiffs' remaining claims.

---

[1] The court accepts the Amended Complaint's allegations as true for the purposes of this order. See Albers v. Bd. of Cnty. Comm'rs of Jefferson Cnty., 771 F.3d 697, 700 (10th Cir. 2014).

## I.      The Plaintiffs' First Investment in ARIIX

Over the course of two meetings in November 2014, the individual Defendants made misleading statements about ARIIX's actual and projected revenue and profits, valuation, and success in China to Mr. Painter, which induced the Plaintiffs to make an initial investment of $1,000,000 in ARIIX in January 2015.  (Id. ¶¶ 29–37, 38, 40–41, 43.)

## II.     The Plaintiffs' Second Investment in ARIIX

In January 2016, Mr. Painter invested another $1,000,000 after Mr. Cooper, Mr. Wilson, Mr. Chandler, and Mr. Yates told him that "ARIIX will generate revenue between $889 Million and $1.1 Billion in sales by 2022; … [b]usiness in China is growing dramatically and sales volumes are increasing; … [and] ARIIX is valued at $90 Million."  (Id. ¶¶ 47, 53.)  In reality, "ARIIX continued to struggle financially ...."  (Id. ¶ 49.)

## III.    The Plaintiffs' Third Investment in ARIIX

Throughout 2016 and 2017, Mr. Cooper, Mr. Yates, Mr. Timmer, and Mr. Wilson told Mr. Painter that ARIIX was increasing its monthly revenues and lowering its effective tax rate by moving profits offshore, bringing its valuation to at least $110,000,000.  (Id. ¶¶ 56, 59, 60, 62.) Mr. Painter invested an additional $1,281,800 in ARIIX in 2017.  (Id. ¶ 64.)

## IV.     The Plaintiffs' Investments in NewAge

The Defendants' next set of misrepresentations concerned ARIIX's technological developments and its November 16, 2020 merger with a company called NewAge, Inc. (NewAge).[2]

---

[2] Edgar, NewAge Nov. 16, 2020 Form 8-K, available at:  https://content.edgar-online.com/ExternalLink/EDGAR/0001493152-20-021765.html?hash=fa1fe507bc6fb4434c5167 ee5be151ebe7bfaa40f6a735a3db9233ea6c83f723&dest=EX10-1_HTM#EX10-1_HTM (last accessed August 18, 2025).

In January 2020, Mr. Cooper and Mr. Yates told Mr. Painter that ARIIX was developing a new customer relation management (CRM) system called ICONN.  (Id. ¶ 73.)  They described ICONN as a "new, highly confidential, proprietary and innovative [backoffice] software" with a "commission engine," that would help "track sales and commissions more accurately and effectively[.]"  (Id. at ¶¶ 73–74, 77.)  Mr. Cooper and Mr. Yates told Mr. Painter that the ICONN software was "owned solely by ARIIX and developed by ARIIX's personnel at ARIIX's expense, and that ICONN had been designed to and would give ARIIX a competitive advantage in the [MLM] marketplace[.]"  (Id. ¶ 75.)  Mr. Cooper and Mr. Yates also said that Mr. Cooper "had been and [was] integrally involved in the development of ICONN and that Cooper was an MLM compensation genius[.]"  (Id. ¶ 79.)  As a result, Mr. Painter believed that ARIIX would benefit from Mr. Cooper's "exclusive provision of the ICONN design, development and commercialization."  (Id.)  The Plaintiffs believed that ICONN was ARIIX's "most valuable asset."  (Id. ¶ 193.)

While the Plaintiffs had private conversations with the Defedants about ICONN, they also allege that "ARIIX's ownership and development of the CRM system" was publicly available information in "the highly competitive MLM industry."  (Id. ¶¶ 76, 80.)  The Plaintiffs do not allege how exactly the market knew about this technology's development.

Around February 2020, Mr. Cooper began negotiating a merger between ARIIX and NewAge, through which NewAge would acquire ARIIX—including ICONN—through a combination of cash, stock and notes.  (Id. ¶ 101.)  But "[u]pon information and belief," Mr. Cooper, Mr. Wilson, and Mr. Yates simultaneously schemed to secretly transfer ARIIX's ICONN technology to another company they had jointly founded, Kwikclick, Inc. (Kwikclick), in advance of the merger.  (Id. ¶¶ 81, 101.)

4

As these confidential merger negotiations continued, ARIIX terminated its Chief Information Officer, who then became the Chief Information Officer of Kwikclick. (Id. ¶ 103.) Mr. Cooper, Mr. Wilson, and Mr. Yates also became officers or employees of Kwikclick. (Id. ¶ 102.) Then, without informing the Plaintiffs, ARIIX's other shareholders, or NewAge, Mr. Cooper, Mr. Wilson, and Mr. Yates transferred ARIIX's ICONN source code to Kwikclick. (Id. ¶¶ 81–82, 104, 109.) Mr. Cooper nonetheless directed ARIIX to continue to pay its former Chief Information Officer's salary and instructed ARIIX's team in China to continue to spend a significant amount of time and money developing the ICONN technology now held by Kwikclick. (Id. ¶¶ 105–06, 108.) Upon the Plaintiffs' information and belief, a source code comparison conducted in or around this period of time indicated a 95% match between the ICONN software and the Kwikclick software. (Id. ¶¶ 177.) ARIIX did not disclose to NewAge that ICONN's source code had been transferred to Kwikclick or that its developers were working on the Kwikclick (formerly ICONN) software. (Id. ¶ 107.) By transferring ICONN to Kwikclick, in advance of the merger, the Defendants ensured that NewAge, despite its plans to buy ARIIX to acquire ICONN, would need to pay licensing fees to Kwikclick to use the CRM tool.

Around July 20, 2020, NewAge publicly announced its plans to merge with and acquire ARIIX in November 2020. (Id. ¶¶ 111–12, 136–40.) The individual Defendants discussed the benefits of this merger and details about ARIIX's financial situation with the Plaintiffs, telling Mr. Painter that 1) "NewAge will make an additional $20 Million in annualized earnings before interest, taxes, depreciation or amortization"; 2) "NewAge will buy products at a discount not previously available"; 3) "Cooper would be the Chairman of the Board of NewAge after the merger"; and 4) "ARIIX's fair valuation for purposes of the merger will be $220,000,000.00."

(Id. ¶ 112.)  Mr. Cooper and Mr. Yates also told Mr. Painter that ARIIX had more than $11 million in working capital and that ARIIX would merge at a price between $5.50 and $6.00 per share.  (Id. ¶¶ 113, 142.)  Mr. Cooper and Mr. Yates did not tell Mr. Painter that ARIIX was at this time conducting internal investigations into whether its corporate officers had violated the Foreign Corrupt Practices Act (FCPA).  (Id. ¶ 95.)

Based on these statements about the merger, the Plaintiffs purchased an additional 6,014,071 shares in NewAge for $10,314,604 between July 2020 and May 2022.  (Id. ¶ 159.) During this period, the Plaintiffs did not receive any express offers to sell their shares in ARIIX. (Id. at ¶¶ 119–27, 154–55.)  But they claim that, before the merger, they had the ability to sell their ARIIX membership units either back to the company or in the private market had they sought to do so.  (See id.)

The ARIIX-New Age merger closed on November 16, 2020.  Mr. Cooper became NewAge's director; Mr. Wilson became the President; Mr. Yates became the Executive Vice President; Mr. Chandler became the Greater China President; and Mr. Timmer became the Global Head of Investor Relations.  (Id. ¶¶ 164–68.)  Ultimately, the merger yielded less immediate shareholder value than the Plaintiffs expected (based on the Defendants' projections).[3]  But in March 2021, Mr. Yates reassured Mr. Painter that the Plaintiffs would be issued additional shares of NewAge to make up the difference.  (Id. ¶ 151.)  Mr. Yates also told Mr. Painter that he expected that NewAge's stock would soon reach $20 per share (up from $1.74 per share at the time of the merger).  (Id. ¶¶ 150, 159.)  Neither of these promises came to

---

[3] Edgar, NewAge November 16, 2020 Form 8-K, available at: https://content.edgar-online.com/ExternalLink/EDGAR/0001493152-20-021765.html?hash=fa1fe507bc6fb4434c5167ee5be151ebe7bfaa40f6a735a3db9233ea6c83f723&dest=EX10-1_HTM#EX10-1_HTM (last accessed August 18, 2025).

fruition.  Instead, NewAge's share price declined further, and the company eventually filed for bankruptcy in August of 2022.  (Id. ¶¶ 190–91.)

After the merger with NewAge, Mr. Cooper drafted and backdated a "sham agreement" between ARIIX and Kwikclick concerning ICONN's source code.  (Id. ¶ 162.)  Mr. Cooper instructed NewAge to pay to expedite the development of the ICONN software (now owned by Kwikclick) even though it would cost NewAge $200,000 per month.  (Id. ¶ 174.)  Then, on September 2, 2021, Mr. Cooper helped NewAge execute a "Software Licensing and Exclusivity Agreement" between NewAge and Kwikclick that contained terms favorable only to Kwikclick—including an agreement that NewAge would pay Kwikclick a monthly licensing fee. (Id. ¶¶ 175–76, 178.)  Mr. Cooper kept the terms of the agreement secret from NewAge's board of directors.  (Id. ¶¶ 175–76.)

Put simply, the Plaintiffs allege that the individual Defendants orchestrated the merger with NewAge to channel NewAge's resources to themselves at the shareholders' expense.  (Id. ¶¶ 124, 208, 215–16.)

## V.    NewAge's Post-Merger Public Disclosures

On March 18, 2021, roughly five months after the ARIIX and NewAge merger, and more than two years before Plaintiffs filed their original complaint, NewAge filed a Form 10-K (March 2021 Form 10-K) with the Securities and Exchange Commission (SEC).  Form 10-Ks are annual reports that publicly traded companies must file, which provide the SEC and the public with a comprehensive overview of the company's business operations, financial performance, and foreseeable risks for the preceding fiscal year.[4]  In its March 2021 Form 10-K, NewAge

---

[4] See Securities and Exchange Commission, Form 10-K, available at:
https://www.investor.gov/introduction-investing/investing-basics/glossary/form-10-k (last accessed August 18, 2025).

disclosed that it had completed the acquisition of ARIIX for $155.1 million on November 16, 2020. (See ECF No. 37 at 5.)[5]  NewAge also disclosed that it had gained $7,408,000 from acquiring ARIIX and that its "[n]et revenue increased from $253.7 million for the year ending December 31, 2019 to $279.5 million for the year ending December 31, 2020, an increase of $25.8 million or 10%." (Id.)  NewAge attributed its increased revenue to ARIIX's revenues from November 16, 2020, through December 31, 2020. (Id.)  The March 2021 Form 10-K also indicated that Mr. Cooper had become a "director" at NewAge on November 16, 2020. (Id.)  Finally, the March 2021 Form 10-K disclosed that ARIIX's working capital amounted to negative $18 million. (Id.)

On August 9, 2021, NewAge announced publicly that it had initiated "an internal investigation in December 2020 with the assistance of external counsel, accountants, and other advisors into ARIIX LLC's international business practices." (Am. Compl. ¶ 184.)  NewAge voluntarily disclosed the investigation to the Department of Justice and SEC. (Id. ¶ 186.)  Ultimately, no FCPA charges were filed.

On September 7, 2021, NewAge issued a press release (September 2021 Press Release) publicly announcing the company's "exclusive licensing deal" with Kwikclick. (Id. ¶ 179.)[6]  The Plaintiffs allege that, from this September 2021 Press Release, the general public learned that "the ICONN Software and/or a similar solution was not actually [acquired] by NewAge" through its merger with ARIIX, and that "the [ICONN CRM] software was instead owned by Kwikclick." (Id. ¶ 181.)  The Plaintiffs allege that after the market learned about the Kwikclick

---

[5] See also NewAge Inc. Form 10-Q for the Period Ending March 31, 2021 at 34, available at: https://www.sec.gov/Archives/edgar/data/1579823/000149315221010838/form10-q.htm (last accessed Aug. 18, 2025).

[6] The Plaintiffs' allegations about the September 2021 Press Release were not featured in their original Complaint. (Compare ECF No. 2, with SAC.)

transfer, NewAge's share price, which was $1.76 before the announcement, decreased by at least 20% to $1.40 in the following weeks—meaning that all investors viewed this revelation as a loss for NewAge.  (Id. ¶¶ 179–80; see also id. ¶ 181 ("Upon information and belief, this decrease in stock price was due to the revelation that the ICONN Software and/or a similar solution was not actually owned by NewAge, but rather owned by Kwikclick."); ¶ 182 ("[T]he price of NewAge stock never fully recovered from this revelation, and thereafter never reached its pre-announcement price of $1.76, eventually becoming valueless[.]"); Pls.' Opp'n Mot. Dismiss, ECF No. 41 at 18 ("Plaintiffs have also asserted that the market thought that NewAge acquired ICONN in the merger and that when it learned that it did not, the price dropped 20% and never fully recovered").)  After the licensing deal was signed, Mr. Cooper drove business to Kwikclick (and therefore to the individual Defendants) by training NewAge's Brand Partners to promote Kwikclick and finalize all sales through the Kwikclick software, rather than through NewAge directly.  (Am. Compl. ¶ 183.)

The Plaintiffs allege that the Defendants' misrepresentations about ARIIX's working capital and misconduct (including FCPA violations), combined with the unfavorable terms of the licensing agreement, caused NewAge's stock price to further decrease when the public learned the truth, contributing to NewAge's 2022 bankruptcy.  (Id. ¶ 190.)

## VI.    Procedural Background

The Plaintiffs filed their Complaint on October 13, 2023.  (ECF No. 2.)  The Complaint asserted several causes of action, including: 1) violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 of the Securities Exchange Act of 1934, 17 C.F.R. § 240.10b-5; 2) violation of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t; 3) violation of Section 12(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77l(a); 4) violation of

the Utah Uniform Securities Act (UUSA), Utah Code Ann. § 61-1-1; 5) common law fraud; 6) negligent misrepresentation; and 7) civil conspiracy.  (Compl. at ¶¶ 135–85.)

On October 26, 2023, the Defendants moved to dismiss the Complaint.  (See Mots. Dismiss, ECF Nos 18–20.)  The Defendants asserted that the case should be dismissed in whole because 1) the Plaintiffs' Section 10(b) and Utah Uniform Securities Act claims were time-barred under the five-year statute of repose; 2) the Plaintiffs' Section 10(b) cause of action failed to satisfy the heightened pleading requirements of Rule 9 of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act (PSLRA); 3) the Plaintiffs failed to plead loss causation, an element of their Section 10(b) claim; 4) the Plaintiffs' Section 20(a) claim failed to plead a primary violation and to plead control; 5) the Plaintiffs' Section 12(a)(2) claim did not state a cause of action; and 6) the court should decline to exercise supplemental jurisdiction over the Plaintiffs' state law claims.  (See, e.g., ECF No. 18 at 2.)

The court granted the Defendants' first motions to dismiss, but also granted the Plaintiffs leave to file an amended complaint.  (Order dated July 25, 2024, ECF No. 35.)  On the time-bar issue, the court found that "the [five-year] statute of repose begins to run from the date of each alleged violation of Section 10(b)" and therefore dismissed any state or federal law securities fraud claims related to the Plaintiffs' purchases of shares in ARIIX before October 13, 2018.  (Id. at 11–13.)

Evaluating the substance of the Plaintiffs' securities fraud allegations, the court determined that the Complaint adequately stated a claim regarding the circumstances of the fraud even though many allegations were based on the Plaintiffs' "information and belief."  (Id. at 18–24.)  The court also found that the Plaintiffs had adequately alleged that Defendants Mr. Cooper, Mr. Yates, Mr. Wilson, and their affiliated corporate entities acted with "scienter" by

intentionally or recklessly misrepresenting or omitting material facts in the process of selling shares of ARIIX and NewAge to the Plaintiffs. (Id. at 26–27.) But the court determined that the first complaint contained no "strong inference of scienter" on behalf of Mr. Chandler and Mr. Timmer, dismissing the claims against these Defendants without prejudice. (Id. at 28–29.) The court also dismissed the Plaintiffs' securities fraud claims without prejudice for failing to adequately plead loss causation. (See id. at 29–32 (Finding that the Plaintiffs had not pled "the merger would not have occurred but for the Defendants' misrepresentations," and likewise "failed to connect the Defendants' alleged fraudulent conduct with NewAge's subsequent bankruptcy").)

The Plaintiffs filed an Amended Complaint on August 24, 2024 (ECF No. 36), which the Defendants moved to dismiss on September 9, 2024. (Second Mot. Dismiss, ECF No. 37 at 3–6.) At the court's request, the parties submitted supplemental briefing on whether the Plaintiffs' federal law securities fraud claims are barred by the two-year statute of limitations. (See Defs.' Suppl. Mem. Mot. Dismiss, ECF No. 55; Pls.' Suppl. Mem. Opp'n Mot. Dismiss, ECF No. 56.)

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff's complaint "must plead facts sufficient to state a claim to relief that is plausible on its face." Slater v. A.G. Edwards & Sons, Inc., 719 F.3d 1190, 1196 (10th Cir. 2013) (internal punctuation omitted) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). A claim is facially plausible when it contains factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged. See Burnett v. Mortg. Elec. Registration Sys., Inc., 706 F.3d 1231, 1235 (10th Cir. 2013). The court must accept all well-pled allegations in the complaint as true and construe them in the light most favorable to the plaintiff. Albers v. Bd. of Cnty. Comm'rs of

Jefferson Cnty., 771 F.3d 697, 700 (10th Cir. 2014). The court's function is "not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." Sutton v. Utah Sch. for the Deaf & Blind, 173 F.3d 1226, 1236 (10th Cir. 1999) (quoting Miller v. Glanz, 948 F.2d 1562, 1565 (10th Cir. 1991)). Courts deciding whether to dismiss a securities fraud claim for failure to state a claim must consider "the totality of the pleadings." Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1092 (10th Cir. 2003).

## DISCUSSION

I.    **Statute of Limitations on Claims for the Purchase of NewAge Shares**

The Defendants move to dismiss the Plaintiffs' federal claims on several grounds, with a threshold argument that the claims are time-barred. The Defendants argue that the Plaintiffs, suing for securities fraud based on their 2020–2022 purchase of shares in ARIIX and NewAge, were on notice for at least two years before filing their first complaint that the Defendants knowingly misrepresented material facts about the merger and ICONN software, meaning that all the Plaintiffs' federal claims are time-barred under 28 U.S.C. § 1658(b). (ECF No. 37 at 4–6; ECF No. 48 at 6–9; ECF No. 55 at 1–5.) For the reasons discussed below, the court agrees, finding that the Plaintiffs either knew or should have known by no later than September 7, 2021—when NewAge issued its press release showing that NewAge had not, through the merger, acquired ICONN, ARIIX's most valuable asset—that the Defendants had intentionally misrepresented material facts about the NewAge-ARIIX merger. Accordingly, all the Plaintiffs' securities fraud claims, filed on October 18, 2023, are barred by the statute of limitations.

A.  **The Statute of Limitations and Statute of Repose**

The court begins its analysis with a discussion of the relevant statutory bars. Securities fraud claims brought under 15 U.S.C. § 78j(b), are subject to two separate timeliness provisions:

a two-year statute of limitations, 28 U.S.C. § 1658(b), and a five-year statute of repose, 28 U.S.C. § 1658(b)(2).  These two provisions begin running on different dates.  By pairing a shorter statute of limitations with a longer statute of repose, the two provisions give "leeway to a plaintiff who has not yet learned of a violation," while still "protect[ing] the defendant from an interminable threat of liability."  California Pub. Employees' Ret. Sys. v. ANZ Sec., Inc., 582 U.S. 497, 506 (2017).

As detailed in the court's July 25, 2024 Order, the five-year statute of repose for securities fraud cases serves as an outer limit, unrelated to a plaintiff's knowledge of his or her claim, setting a five-year limitations period "[running] from the date of each alleged violation of Section 10(b)."  Hogan v. Pilgrim's Pride Corp., 73 F.4th 1150, 1156 (10th Cir. 2023).  Applying the statute of repose, the court has already dismissed any allegations of securities fraud relating to purchases of securities that took place before October 13, 2018.

Under the relevant statute of limitations, 28 U.S.C. § 1658(b), a plaintiff must file his or her claim within two years of when he or she either discovered or should have discovered the facts underlying a defendant's violation of Section 10(b) of the Securities and Exchange Act.  E.g., Nat'l Credit Union Admin. Bd. v. Nomura Home Equity Loan, Inc., 764 F.3d 1199, 1224 (10th Cir. 2014); Sterlin v. Biomune Sys., 154 F.3d 1191, 1201, 1203 (10th Cir. 1998) (holding that the two-year discovery period "begins to run once the investor, in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud[,]" meaning that "[i]nquiry notice is triggered by evidence of the possibility of fraud, not full exposition of the scam itself").  Importantly, either actual or inquiry notice of fraud will start the two-year clock, meaning that it is not necessary for a party to have "full knowledge of the nature and extent of the fraud for the party to be on discovery notice."  Blackmore/Cannon Dev. Co., LLC v. U.S.

13

Bancorp, No. 2:08-cv-370-CW, 2010 WL 1816275, at *5 (D. Utah May 3, 2010) (citations omitted).

In Merck & Co. v. Reynolds, the United States Supreme Court explained:

In determining the time at which "discovery" of those "facts" occurred, terms such as "inquiry notice" and "storm warnings" may be useful to the extent that they identify a time when the facts would have prompted a reasonably diligent plaintiff to begin investigating. But the limitations period does not begin to run until the plaintiff thereafter discovers or a reasonably diligent plaintiff would have discovered "the facts constituting the violation," including scienter—irrespective of whether the actual plaintiff undertook a reasonably diligent investigation.

559 U.S. 633, 653 (2010). Accordingly, courts examining a defendant's statute of limitations defense to fraud must examine when a reasonably prudent investor under the circumstances actually knew or should have realized both that the defendant had 1) made a fraudulent misrepresentation or omission, and 2) did so knowingly or intentionally, with "scienter." Id. at 649 ("It would therefore frustrate the very purpose of the discovery rule in this provision—which, after all, specifically applies only in cases 'involv[ing] a claim of fraud, deceit, manipulation, or contrivance,' § 1658(b)—if the limitations period began to run regardless of whether a plaintiff had discovered any facts suggesting scienter.").

To determine whether a plaintiff knew or should have known that a defendant misrepresented material facts "with scienter," courts must examine the contents of the misrepresentations alleged in the complaint. That is because

[courts] recognize that certain statements are such that, to show them false is normally to show scienter as well. It is unlikely, for example, that someone would falsely say "I am not married" without being aware of the fact that his statement is false. Where § 10(b) is at issue, however, the relation of factual falsity and state of mind is more context specific. An incorrect prediction about a firm's future earnings, by itself, does not automatically tell us whether the speaker deliberately lied or just made an innocent (and therefore nonactionable) error.

Merck & Co., 559 U.S. at 649–50.[7]  Put simply, the Supreme Court recognizes that the contents of some fraudulent misrepresentations automatically indicate to the listener that the speaker must have knowingly and intentionally misrepresented the facts.

The category of misrepresentations that automatically indicate a defendant's scienter includes situations where a defendant's misstatements cannot be classified as an honest mistake, opinion, or optimistic prediction because those statements can and could have been objectively verified.  For example, as discussed in Merck & Co., an individual is either married or he is not—he cannot make an honest mistake or miscalculation about his own marital status.  559 U.S. at 649–50.  If a plaintiff learns that a defendant misrepresented his marital status, the plaintiff is therefore on notice that the defendant willfully misled him.  Similarly, a company either owns a product, or it does not.  If a company says it owns a product and the listener later learns that the product is instead wholly owned by a third party, then the plaintiff should assume the company willfully misled him because there is no plausible, nonculpable explanation.  In these factual scenarios, upon learning the truth, the listener is put on constructive notice of the speaker's scienter or willfulness, giving him two years to bring a claim under Section 10(b) of the Securities and Exchange Act.

But claims brought under Section 10(b) of the Securities and Exchange Act often involve "gray area" misrepresentations, which an investor might reasonably assume were an honest mistake, sales puffery, or overly optimistic projection.  For example, when marketing a transaction, a seller might say that he predicts that a firm's earnings next year will hit $10 million

---

[7] In Merck & Co., the Supreme Court held that a pharmaceutical manufacturer's receipt of a warning letter from the Food and Drug Administration about the risks of heart attacks accompanying the use of its drug did not trigger the statute of limitations for claims about the manufacturer's false advertisement given that the warning letter did not indicate one way or the other that the manufacturer had acted with fraudulent intent.  559 U.S. at 649–50.

annually.  If the firm instead makes $5 million, a prudent investor could reasonably conclude that the speaker had made an "innocent (and therefore nonactionable error)" in trying to predict the future.  Id.  In other words, the seller could have, in good faith, underestimated market trends; alternatively, the seller's revenues could have been impacted by an unforeseeable shock to the system, like a pandemic.  In those circumstances, when an investor learns of the discrepancy between the seller's predicted and actual financial performance, the two-year statute of limitations is not necessarily triggered unless there is additional evidence showing that the speaker intended to deceive him.

"A statute of limitations defense is not typically part of a Rule 12(b)(6) motion because complaints are not required to anticipate such affirmative defenses to survive a motion to dismiss."  Antelis v. Freeman, 799 F. Supp. 2d 854, 860 (N.D. Ill. 2011) (citing Andonissamy v. Hewlett-Packard Co., 547 F.3d 841, 847 (7th Cir. 2008); U.S. v. Lewis, 411 F.3d 838, 842 (7th Cir. 2005); Tregenza v. Great Am. Commc'ns Co., 12 F.3d 717, 718 (7th Cir. 1993) ("The statute of limitations is an affirmative defense, and a plaintiff is not required to negate an affirmative defense in his complaint.")).  But "in cases where a plaintiff has affirmatively pleaded facts indicating his suit is time barred… a judge should grant a defendant's motion to dismiss."  Id. (citing Whirlpool Fin. Corp. v. GN Holdings, Inc., 67 F.3d 605, 608 (7th Cir. 1995) ("[I]n the context of securities litigation, if a plaintiff pleads facts that show its suit is barred by a statute of limitations, it may plead itself out of court under a Rule 12(b)(6) analysis.")).

Turning to the Amended Complaint, the Plaintiffs allege that prior to the closing of the NewAge merger, but within five years of filing the original complaint, the Defendants made numerous material misstatements that caused the Plaintiffs to 1) purchase shares of ARIIX and NewAge; and 2) hold onto, rather than sell, their ARIIX shares.  Specifically, the Plaintiffs claim

that they relied on the Defendants' misrepresentations that: 1) ARIIX had over $11 million in working capital (Am. Compl. ¶¶ 87, 91); 2) the NewAge and ARIIX merger would close at a $5.50 to $6 per share price (id. ¶¶ 142-43); 3) ARIIX had large future revenues (id.); 4) "[Mr.] Cooper would be the Chairman of the Board of NewAge after the merger" (id. ¶¶ 112, 119, 123, 139, 146); 5) the merger valuation would be $220 million (id. ¶¶ 112, 119, 123, 144, 145, 150); and 6) through the merger, NewAge would acquire the ICONN software, ARIIX's most valuable asset (id. ¶¶ 88, 181).  The Defendants argue that the truth was revealed and disclosed in 1) NewAge's March 2021 Form 10-K; 2) NewAge's March 2021 valuation, data which is publicly available; and 3) NewAge's September 2021 Press Release announcing its licensing agreement with Kwikclick for the ICONN software.

The court discusses each of these potential indications of the Defendants' fraud in turn, and finds that the Defendants' alleged misrepresentations about the ownership of the ICONN software falls into the "automatic indicator of scienter" category referred to in Merck & Co.— meaning that once NewAge published its September 2021 Press Release, the Plaintiffs were on actual or inquiry notice that the Defendants had misrepresented material terms of the merger transaction with scienter, triggering the two-year statute of limitations.  Because the two-year period ran before the Plaintiffs filed their first complaint, the Plaintiffs' federal securities law claims must be dismissed.

### 1. NewAge's March 2021 Form 10-K and March 2021 Valuation

The Defendants first argue that NewAge's March 2021 Form 10-K, publicly filed on March 18, 2021, along with NewAge's March 2021 stock prices, which were public knowledge, contradicted several of the Defendants' alleged misrepresentations about the merger—including ARIIX's valuation and working capital; NewAge's future revenue predictions; and Mr. Cooper's

status as chairman at NewAge—and that the Plaintiffs therefore must have been on notice of the Defendants' fraud by no later than March 2021.  (See ECF No. 37 at 5.)[8]  The Defendants argue that the Plaintiffs' failure to file their Complaint by March of 2023 is fatal to their securities fraud claim.  The Plaintiffs counter that these two events, the March 2021 Form 10-K filing and the March 2021 stock prices, did not trigger the statute of limitations.  The Plaintiffs first contend that, on a motion to dismiss, they cannot be deemed "on notice" of the contents of NewAge's Form 10-K filing, which they did not actually review upon its publication.  Second, the Plaintiffs argue that even if they had (or should have) reviewed these filings and learned that the Defendants' pre-merger representations were wrong, a reasonable investor would have had no reason to know that the Defendants had committed fraud knowingly, with scienter.  Third, the Plaintiffs dispute that the substance of NewAge's March 2021 Form 10-K directly contradicts the Defendants' misrepresentations about the merger.  (See, ECF No. 41 at 4–6.)

As an initial matter, the court must first address whether the Plaintiffs can be deemed "on notice" of the contents of a public company's Form 10-K, an issue the Tenth Circuit has not directly addressed.  The court is persuaded that investors are on inquiry notice of publicly available filings, like Form 10-Ks, based on the Tenth Circuit's conclusion that news articles in business periodicals are sufficient to trigger an investor's reasonable diligence to inquire about suspected fraud.  See Sterlin v. Biomune Sys., 154 F.3d 1191 (10th Cir. 1998) (finding that a "dear shareholder" letter published in Barrons, an investing publication for financial news, was sufficient to trigger notice).  The court can discern no meaningful difference between a reasonably prudent investor's obligation to regard business publications for notice of fraud, but

---

[8] NewAge Inc. March 2021 Form 10-K for the Period Ending December 31, 2020, available at: https://www.sec.gov/ix?doc=/Archives/edgar/data/1579823/000149315221006345/form10-k.htm (last accessed March 14, 2025).

not Form 10-Ks, which are a standard source of information for evaluating a public company's financial performance.  Indeed, other courts in this Circuit have held that investors are on constructive or inquiry notice of the facts contained in a company's Form 10-K.  See, e.g., In re Thornburg Mortg., Inc. Sec. Litig., 695 F. Supp. 2d 1165, 1204 n.26 (D.N.M. 2010) (finding investor was on inquiry notice of the contents of the Form 10–K disclosure and "would be able to put two and two together" and realize that there had been material misstatement), reconsideration granted in part on other grounds, 824 F. Supp. 2d 1214 (D.N.M. 2011), aff'd sub nom. Slater v. A.G. Edwards & Sons, Inc., 719 F.3d 1190 (10th Cir. 2013).[9]

Courts outside this Circuit have addressed the issue of inquiry notice surrounding a public company's SEC filings and concluded the same.  For example, the Third Circuit holds that investors are on notice of statements made in a company's Form 8-K.  See In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1329 (3d Cir. 2002) (citing Gruber v. Price Waterhouse, 697 F. Supp. 859, 863 (E.D. Pa. 1988)).  Form 8-Ks are notably similar to Form 10-Ks: instead of being filed annually, like a Form 10-K, or quarterly, like a Form 10-Q, Form 8-Ks are filed by publicly traded companies that experience an off-cycle significant or material business event, like a merger.[10]  The Second Circuit, which hears the majority of securities fraud cases, "will … normally charge investors with notice of the information in the [Form] 10–K."  Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 433–34 (2d Cir. 2008); see also Dietrich v. Bauer,

---

[9] The statements in NewAge's March 2021 Form 10-K are offered, not for their truth, but because they contradict other statements made by the individual Defendants.  Accordingly, the Defendants' Form 10-K is not inadmissible hearsay under Rule 803 of the Federal Rules of Evidence.  E.g., Karacand v. Edwards, 53 F. Supp. 2d 1236, 1246 (D. Utah 1999) (considering SEC filings on a motion to dismiss because "the exhibits are offered not only for their truth, but also to demonstrate the state of mind of the individual defendants").

[10] Securities and Exchange Commission, Definition of a Form 8-K, available at: https://www.investor.gov/introduction-investing/investing-basics/glossary/form-8-k (last accessed August 18, 2025).

76 F. Supp. 2d 312, 343-44 (S.D.N.Y. 1999) ("The information that triggers inquiry notice of the probability of an alleged securities fraud is any financial, legal, or other data, including public disclosures … available to the plaintiff providing him with sufficient storm warnings to alert a reasonable person to the probability that there were either misleading statements or significant omissions involved in the sale of the securities.").  The United States District Court for the Eastern District of Michigan similarly holds that investors are on inquiry notice of the contents of a Form 10-K.  See Havenick v. Network Exp., Inc., 981 F. Supp. 480, 514, 517 (E.D. Mich. 1997) (dismissing securities fraud claim as "outside the statute of limitations period" where Form 10-K, among other publicly available sources, like Prospectuses or press releases, contradicted plaintiffs' claims).  The court adopts these persuasive holdings, recognizing that the Plaintiffs, as reasonably prudent investors, were on notice, inquiry or actual, of the contents of NewAge's March 2021 Form 10-K.

The court next examines 1) whether the information in the March 2021 Form 10-K or the company's March 2021 valuation contradicted the Defendants' alleged misrepresentations; and if so, 2) whether these contradictions were sufficient to notify the Plaintiffs that the Defendants acted with the intent to deceive.  The court considers each alleged contradiction in turn.

The Defendants first argue that the Plaintiffs should have known about the Defendants' fraudulent scheme because NewAge's actual merger value ($155 million) was apparent in March 2020, shortly after the November 2020 merger, and was far less than what the Defendants had represented it would be.  (See ECF No. 37 at 5; Am. Compl. ¶ 112.)   But it is easy to imagine non-fraudulent reasons—such as changed market conditions or honest miscalculation—for why ARIIX's predicted valuation was higher than the market's actual valuation several months later. And the court notes that the Defendants allegedly continued to provide false assurances about

NewAge's financial future, giving the Plaintiffs reason to ignore indicators that something was amiss. (Am. Compl. ¶¶ 151–53.) Accordingly, this factual contradiction, without more, is insufficient to provide notice that the Defendants acted with scienter.

Second, the Defendants contend that the Plaintiffs should have discovered the Defendants' fraud because NewAge's March 2021 Form 10-K reported significantly lower post-merger revenues than the individual Defendants advertised. (ECF No. 37 at 6.) This argument fails for the same reason discussed above: there are good faith explanations, like market changes, over-optimism, and honest miscalculation, for why these projections proved off-base. The contradiction alone does not show the Defendants' ill intent.

Third, the Defendants argue that statements in NewAge's March 2021 Form 10-K about the cash that NewAge acquired from ARIIX through the merger should have put the Plaintiffs on notice that the Defendants had lied about ARIIX's working capital. (Am. Compl. ¶ 113; ECF No. 37 at 6.) But, as the Plaintiffs counter, "[w]orking capital is the difference between all [of a company's] assets and all [of its] liabilities." (ECF No. 41 at 5.) It is therefore unsurprising that ARIIX's working capital differs from its cash on hand, which does not factor in liabilities. In any event, the court notes that it is plausible that ARIIX's working capital as of July 2020 could, for legitimate, non-fraudulent reasons, differ from its working capital as of the November 2020 merger—for example, ARIIX might have spent money to continue developing ICONN.

Fourth, the Defendants argue that the Plaintiffs should have discovered the alleged fraud because NewAge's March 2021 Form 10-K disclosed that Mr. Cooper was only a "director" at NewAge, while the Defendants told the Plaintiffs that Mr. Cooper would become the Chairman of the NewAge Board. (Am. Compl. ¶ 112.) While there is a difference between being a director or a chairman, this contradiction is not material enough to signal the Defendants'

fraudulent intent.  It is possible that, as the negotiations were ironed out between July and November 2020, NewAge, acting in good faith, changed its mind about Mr. Cooper's role at the newly merged company or simply rebranded its executives' job titles.  Alternatively, Mr. Cooper could have, in good faith, chosen to take on less responsibility at NewAge.

In sum, the court finds that neither NewAge's March 2021 Form 10-K nor its financial state after the merger triggered a two-year statute of limitations for the Plaintiffs' securities fraud claims.

### 2.  NewAge's September 2021 Press Release

Alternatively, the Defendants argue that the Plaintiffs were on notice that the Defendants made fraudulent misrepresentations with scienter by virtue of NewAge's September 2021 Press Release, in which NewAge announced that it would be exclusively licensing CRM technology from Kwikclick—a licensing arrangement which contradicted the Defendants' stated purpose for merging ARIIX with NewAge.  (See Am Compl. ¶ 179.)

The Plaintiffs first argue that the court cannot consider the September 2021 Press Release because Mr. Painter, who directed the Plaintiffs' investments, "does not recall reviewing [the September 2021 Press Release]."  (ECF No. 56 at 4.)  As a preliminary matter, the court finds that it can consider whether the September 2021 Press Release provided the Plaintiffs with notice, actual or constructive, of the scheme regardless of whether Mr. Painter reviewed or recalls reviewing the announcement.  As discussed above in the court's notice analysis regarding Form 10-Ks, the Plaintiffs, as reasonably prudent investors, should be on notice of publicly distributed facts about NewAge.  See, e.g., Pension Tr. Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc., 730 F.3d 263, 276–77 (3d Cir. 2013) (finding a reasonably diligent plaintiff would undertake an investigation based on "'news articles and

analyst's reports,' and 'prospectuses, quarterly reports, and other information related to their investments'"); Gavin/Solmonese LLC v. D'Arnaud-Taylor, 68 F. Supp. 3d 530, 536 (S.D.N.Y. 2014) (considering public documents in evaluating statute of limitations defense on motion to dismiss), aff'd, 639 F. App'x 664 (2d Cir. 2016).

In any event, the court must discount Mr. Painter's claimed ignorance to NewAge's September 2021 Press Release given that the Plaintiffs simultaneously allege, as part of their causation argument, that the market learned about the ICONN transfer as a result of the September 2021 Press Release, causing the NewAge stock price to plummet and contributing to NewAge's bankruptcy. (Am. Compl. ¶¶ 179–81, 198). Put simply, the Plaintiffs cannot have it both ways: they cannot argue that the market as a whole learned about the Defendants' intellectual property theft from the circulation of the press release, but simultaneously contend that they had no reason to know about the contents and implications of the September 2021 Press Release.[11] See, e.g., Karacand v. Edwards, 53 F. Supp. 2d 1236, 1246 (D. Utah 1999) ("Having raised questions about defendants' stock sales, based their allegations on defendant's SEC filings, and submitted expert declarations that rely on the SEC forms at issue, plaintiffs can hardly complain when defendants refer to the same information in their defense.").

The Plaintiffs argue next that, even if they were on notice of the September 2021 Press Release, the "suggestion that NewAge may no longer own ICONN based on the [September 2021 Press Pelease] ... [could not create] the required 'strong inference' of scienter triggering a [statute of limitations]." (ECF No. 56 at 1–2 (citing Merck & Co., 559 U.S. at 640).) The Plaintiffs claim that even if they had read the September 2021 Press Release, they would not

---

[11] In its analysis of loss causation, the court addresses whether the Plaintiffs plausibly allege that the market knew (in advance of the merger) that ARIIX was developing and owned the ICONN technology.

have known "the true nature, development, anticipated and actual transfer of ICONN (or some

part) and the license back arrangement, or the roles/intent of those involved." (Id. at 2.) They

further argue that "this situation is more akin to a speaker representing they are married in

January 2020 and the listener later learning that [the speaker is] no longer married." (Id. at 2–3.)

The court disagrees, finding that, from the Plaintiffs' notice—actual or inquiry—of the

September 2021 Press Release, the Plaintiffs either knew or should have known that the

Defendants knowingly misrepresented ARIIX's ownership of ICONN, its "most valuable asset,"

to sell the Plaintiffs ARIIX shares in advance of the NewAge merger. (Am. Compl. ¶ 193.)

Indeed, it is the Plaintiffs who allege that their continued and increased investment in ARIIX and

NewAge through the merger was dependent upon ARIIX's ownership of the ICONN software.

(See, e.g., id. ¶ 80 ("ARIIX's foregoing development and ownership of ICONN and the details of

how ICONN would disrupt the MLM … industry and benefit ARIIX members were represented

to and understood by ARIIX investors."); ¶ 119 ("[B]ut for Cooper, Yates, and the other

Defendants' foregoing material misrepresentation[s] and non-disclosures including … the true

status of the ICONN software … Plaintiffs would not have held their membership units over the

course of the merger.").) And it is the Plaintiffs who allege that the merger revolved around

NewAge's desire and intent to own—not license—the ICONN technology. (See, e.g., id. ¶ 79

("Cooper and Yates represented that … ICONN would be used exclusively by ARIIX to

capitalize on evolving marketing advantages, including through strategic mergers or

acquisition."); ¶ 84 ("By June 2020, ARIIX and NewAge were engaged in negotiations for

NewAge to acquire ARIIX's business as a going concern, including ARIIX's intellectual

property and the ICONN CRM system."); ¶ 193 (referring to ICONN as ARIIX's "most valuable

asset").) If, as the Plaintiffs allege, knowing the true ownership of the ICONN software would

24

have been enough to 1) provide the Plaintiffs with a reason to stop the merger; 2) cause the

Plaintiffs to assert their dissenters' right to sell back their shares to ARIIX; or 3) dissuade the

Plaintiffs from buying additional shares in NewAge, then surely NewAge's announcement would

have demonstrated to the Plaintiffs that the Defendants knowingly misrepresented material

details about the merger or, at the very least, triggered their duty to investigate.

  The court's finding that the Plaintiffs had constructive or actual knowledge of the

Defendants' scienter by virtue of the September 2021 Press Release is consistent with other

federal courts' statute of limitations analyses, which have persuasively concluded that securities

fraud "[p]laintiffs need not know all of the details or 'narrow aspects' of the alleged fraud to

trigger the limitations period; instead, the period begins to run from 'the time at which plaintiff

should have discovered the general fraudulent scheme.'"  In re Prudential Ins. Co. Sales

Practices Litig., 975 F. Supp. 584, 599 (D.N.J. 1997) (quoting McCoy v. Goldberg, 748 F. Supp.

146, 158 (S.D.N.Y. 1990)).  For example, in In re NAHC, Inc. Securities Litigation, the Third

Circuit found that a plaintiff's claim was barred by the statute of limitations because the

defendant's Form 8-K, filed more than two years before the complaint, could be characterized as

the "culmination of a series of disclosures … [demonstrating] that [the defendants'] business was

in trouble [and] had no valuable goodwill," putting the plaintiffs on inquiry notice of a fraudulent

scheme.  306 F.3d 1314, 1326 (3d Cir. 2002).  So too, here, NewAge's September 2021 Press

Release, which the Plaintiffs concede put investors on notice that ARIIX did not in fact own the

ICONN software, was sufficient to show a reasonably prudent investor that the merger had in

fact deprived NewAge of the benefit or goodwill of ARIIX's most valuable asset.  And the

court's inference of scienter is particularly strong when viewed in conjunction with the

contradictions evidenced in NewAge's March 2021 Form 10-K and the company's poor financial

performance, as discussed above.  The Plaintiffs cannot avoid the statute of limitations only because they did not know each individual Defendants' precise role in achieving this fraud.

Similarly, in <u>Gavin/Solmonese LLC</u>, the United States District Court for the Southern District of New York examined contradictions within the defendant's Form 8-K and found that the "warning signs" of fraud were significant enough to put the plaintiff on notice of the defendant's intentional misrepresentations.  68 F. Supp. 3d at 536, <u>aff'd</u> 639 F. App'x 664 (2d Cir. 2016).  Specifically, the Form 8-K disclosed that the defendant's intellectual property was "proprietary technology" that included pending patents.  But at the same time, the defendant's Form 8-K also stated that the defendant's intellectual property was "unworkable … and would need to be rebuilt from scratch."  <u>Id.</u>  As a result, the intellectual property was written down to zero on the company's balance sheet.  The court held that these contradictions about the ownership and value of the defendant's intellectual property, in conjunction with the context of the defendant's poor financial performance, were sufficient to put the investors on inquiry notice of the defendants' knowing fraud.  <u>Id.</u> at 537 ("Given this information, the [plaintiffs] were aware or should have been aware of the key facts necessary to plead their securities fraud claims against the [] defendants more than two years prior to the filing of this claim.").

The Plaintiffs maintain that they could have reasonably assumed that ARIIX had a legitimate, non-fraudulent business reason to transfer ARIIX's most valuable intellectual property to Kwikclick, undermining any suspicion that the Defendants knowingly committed securities fraud.  <u>Id.</u> at 3.  But they provide no plausible, nonculpable explanation—nor can the court independently identify one—for how transferring ARIIX's most valuable intellectual property, ICONN, to a third company they own and then charging ARIIX (now merged with NewAge) to use the software could have possibly benefitted ARIIX, NewAge, or shareholders.

And importantly, the Plaintiffs do not allege that they did any due diligence to confirm or deny a suspicion of wrongdoing, or that the Defendants reassured them about the legitimacy of the transfer of the technology, therefore allaying their concerns.  E.g., Pension Tr. Fund for Operating Eng'rs, 730 F.3d at 277 ("reassurances can dissipate storm warnings").  Indeed, the Plaintiffs allege that the general public's realization about the ICONN software's transfer was enough to immediately drive down NewAge's share price—another indication to the Plaintiffs that something had gone wrong.

In sum, while the Plaintiffs argue that the September 2021 Press Release did not reveal the exact nature, development, or parameters of ARIIX's transfer of the technology to Kwikclick (ECF No. 57 at 4), the "facts need not perfectly match the allegations that a plaintiff chooses to include in its complaint in order for the statute of limitations to run."  Gavin/Solmonese LLC, 68 F. Supp. at 537 (citing In re Magnum Hunter Res. Corp. Sec. Litig., 26 F. Supp. 3d 278 (S.D.N.Y. 2014); Freidus v. Barclays Bank PLC, 734 F.3d 132, 139 (2d Cir. 2013); Staehr v. Hartford Fin. Servs. Grp., 547 F.3d 406, 427 (2d Cir. 2008) (finding that an "investor does not have to have notice of the entire fraud being perpetrated to be on inquiry notice")).  The Plaintiffs should have been aware by September 7, 2021—or, at the latest, two weeks later, when the share price plummeted 20%—that the Defendants knowingly misrepresented material terms about the merger.  But because the Plaintiffs did not file this action until October 13, 2023, they fail to plead compliance with the statute of limitations.

## II.    Failure to State a Claim

In the alternative, dismissal is appropriate because the Plaintiffs fail to state a claim for securities fraud under Section 10(b) of the Securities and Exchange Act.  The Plaintiffs must allege that, in connection with the purchase or sale of a security: (1) the defendant made a

material misrepresentation or omission (the circumstances of fraud); (2) with scienter; (3) on which the plaintiff justifiably relied; and (4) that caused the plaintiff to incur economic loss (loss causation).  See Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 342 (2005).

Securities fraud plaintiffs must meet the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure, providing that plaintiffs alleging fraud or mistake "must state with particularity the circumstances constituting fraud or mistake."  Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1095 (10th Cir. 2003) (citing City of Philadelphia v. Fleming Cos., Inc., 264 F.3d 1245, 1258 (10th Cir. 2001)).  In other words, plaintiffs must "set forth what is false or misleading about a statement, and why it is false," Grossman v. Novell, Inc., 120 F.3d 1112, 1124 (10th Cir. 1997), and detail "the time, place, and contents of the false representation, the identity of the party making the false statements and the consequences thereof."  Jensen v. Am.'s Wholesale Lender, 425 F. App'x 761, 763 (10th Cir. 2011).  Congress heightened the pleading standard for federal securities fraud claims with the passage of the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u-4(b)(1), (2), which enacted similarly heightened standards for pleading the element of scienter.  Adams, 340 F.3d at 1095.

Here, the Defendants challenge the sufficiency of the Plaintiffs' allegations on the first and second elements, which are subject to the heightened pleading requirement, and the fourth element, which need not be pled with particularity.  E.g., Dura Pharms., Inc., 544 U.S. at 346 ("[N]either the Rules nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss.").  For the reasons discussed below, the court finds the Plaintiffs fail to adequately plead loss causation.

### A. Circumstances of Fraud

The court has already determined that the allegations in the Plaintiffs' original complaint are sufficient to demonstrate that Mr. Cooper, Mr. Yates, and Mr. Wilson, along with their associated corporate entities, made material fraudulent misrepresentations. (ECF No. 35 at 20–25.) The court will not revisit this finding.

But the court finds that the Plaintiffs' fraud allegations are still too vague regarding Riley Timmer, Ian Chandler, and their co-Defendant entities Timmer Family Investments, LLP, Chandler Family Investments LLC, Chandler Family Investments 2.0, LLC, and Chandler Family Investments, Ltd. (ECF No. 37 at 20.)[12] Since amending their first complaint, the Plaintiffs still have not bolstered their claims with respect to these Defendants' mental states or involvement in the alleged scheme. (See Am. Compl.) The only misrepresentations attributed to Mr. Chandler personally are from 2015 and 2016, while the only misrepresentations attributed to Mr. Timmer are from 2016 and 2017. (Id. at ¶¶ 47, 53, 56.) Accordingly, the Plaintiffs' fraud claims against these individual Defendants and their associated entities are dismissed with prejudice.

### B. Scienter

The Defendants next argue that the Plaintiffs have failed to allege the scienter element of their claim with the specificity required by Rule 9 of the Federal Rules of Civil Procedure and the PSLRA. But the court has already ruled on this issue, finding that Plaintiffs adequately alleged that Defendants Mr. Cooper, Mr. Yates, and Mr. Wilson acted with scienter on the basis that these Defendants had a motive to defraud their investors because they stood to benefit

---

[12] The court already dismissed claims against these Defendants without prejudice on the basis that the Plaintiffs' original complaint failed to adequately allege that these specific Defendants had acted with scienter, granting the Plaintiffs leave to amend. (See ECF No. 35 at 29.)

financially from their conduct by virtue of their interest in Kwikclick and NewAge and had knowledge of the facts or access to information contradicting their public statements.  (See ECF No. 35 at 26–28.)  This motive can also be attributed to these Defendants' related entities.  And as the court has already held, allegations about the Defendants' mental state can be alleged on "information and belief" so long as the facts alleged "support[] a reasonable belief that [Defendants] made statements that were false and misleading."  (ECF No. 35 at 19.)

The Defendants also contend that the Plaintiffs fail to meet the pleading standards for the element of scienter because their allegations are based in part on allegations drawn from NewAge's unresolved bankruptcy proceeding.  (ECF No. 37 at 9 (citing RSM Production Corp. v. Fridman, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009); Lipsky v. Commonwealth United Corp., 551 F.2d 887, 892–94 (2d Cir. 1976)).  But only a few of the Plaintiffs' allegations mirror filings from NewAge's bankruptcy proceedings.  (See Am. Compl. ¶¶ 210–13.)  And the court cannot be certain that these bankruptcy proceeding filings are the sole basis for the Plaintiffs' allegations about the Defendants' scienter.  Because the Tenth Circuit does not require plaintiffs to disclose the sources from which they obtained knowledge of the facts they are alleging, the court will not require the Plaintiffs to further justify or support these allegations.  Adams, 340 F.3d at 1100.

Finally, the Defendants argue that the Plaintiffs have not adequately pled scienter because some of allegations—specifically, that NewAge never owned ICONN and made improper $200,000 monthly payments to Kwikclick—are contradicted by NewAge's SEC filings and the terms of its Licensing Agreement with Kwikclick.  (ECF No. 37 at 10–11, 12.)  Put simply, the Defendants argue that because NewAge told the SEC that NewAge would pay Kwikclick $50,000 to license and use its CRM software, the court cannot accept as true (for purposes of deciding this motion) the Plaintiffs' allegations about the $200,000 payments.  But the Plaintiffs

claim that the Defendants actively concealed their fraudulent misconduct—meaning that, while the Defendants may have publicly disclosed the licensing arrangement, the court still cannot presume that the statements contained in those financial statements are true.[13]

In sum, as the court has already recognized, the Plaintiffs have adequately alleged that the remaining Defendants' misrepresentations were made with scienter.

### C. Loss Causation

The court dismissed the Plaintiffs' first complaint without prejudice on the basis that Plaintiffs failed to adequately plead loss causation, a "causal link between the alleged misconduct and the economic harm ultimately suffered by plaintiff." In re Williams Sec. Litig. WCG Subclass, 558 F.3d 1130, 1136 (10th Cir. 2009). The Defendants now argue that the Amended Complaint, like the first complaint, "fails to account … for the possibility that Plaintiffs' losses were caused by the actions of the other Defendants, market, industry or company-specific factors" instead of the "myriad of other factors that affect a company's stock price." (ECF No. 37 at 17 (citing In re Williams, 558 F.3d at 1137).) The court agrees, dismissing the Plaintiffs' securities fraud claim on this independent basis, in addition to the statute of limitations' time bar.

In cases involving the purchase of stock at inflated prices, a plaintiff must show there was a causal connection between the loss and the misrepresentation, meaning that the plaintiff's

---

[13] This finding is consistent with the Federal Rules of Evidence. While courts can consider documents attached to or referenced in a motion to dismiss as indicators of fraud, it cannot take as true the truth of the matter asserted therein. See, e.g., Utah Gospel Mission v. Salt Lake City Corp., 425 F.3d 1249, 1253–54 (10th Cir. 2005) (holding, on a motion to dismiss, that courts may consider "a document central to the plaintiff's claim and referred to in the complaint . . . where the document's authenticity is not in dispute"); Tal v. Hogan, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006) (holding that when a court takes judicial notice of documents, it may do so only to "show their contents, not to prove the truth of the matters asserted therein").

losses "were attributable to the revelation of the fraud and not the myriad other factors that affect a company's stock price." In re Williams, 558 F.3d at 1137; see also Nakkhumpun v. Taylor, 782 F.3d 1142, 1154 (10th Cir. 2015) ("To plead loss causation, a plaintiff must allege facts showing a causal connection between the revelation of truth to the marketplace and losses sustained by the plaintiff."). The loss causation analysis is different where a plaintiff's loss is attributable to a merger. In these cases, courts consider a "theory of transaction causation—[meaning] that, but for the actionable misstatements and omissions, the shareholder approval and ensuing exchange of outstanding shares … would have not occurred." Altimeo Asset Mgmt v v. Qihoo 360 Tech. Co. Ltd., 663 F. Supp. 3d 334, 365 (S.D.N.Y. 2023).

Where a shareholder gave up the opportunity to sell its shares or block a merger or other transaction due to a fraudulent misrepresentation, a plaintiff can show loss causation "by showing that the defendant's misrepresentation concealed a risk that caused a loss for the plaintiff when the risk materialized." Nakkhumpun v. Taylor, 782 F.3d 1142, 1154 (10th Cir. 2015). Accordingly, a plaintiff must plead that the risk concealed was not "foreseeable," and that "the materialization of the risk caused the negative impact on the value of the securities." Id. "Any theory of loss causation would still have to identify when the materialization [or corrective disclosure] occurred and link it to a corresponding loss." In re Williams, 558 F.3d at 1138. "[T]he fact that a stock's 'price on the date of purchase was inflated because of [a] misrepresentation' does not necessarily mean that the misstatement is the cause of a later decline in value." Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 812 (2011) (citing Dura Pharms., 544 U.S. at 342–43). The plaintiff must rule out intervening events, like "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events." Id.; see also In re Williams, 558 F.3d at 1138.

In its July 2024 Order dismissing the Plaintiffs' first complaint, the court outlined three ways by which the Plaintiffs could plausibly allege loss causation, granting the Plaintiffs leave to amend and bolster their claims.  The court addresses each loss causation theory in turn.

### 1. Merger-Related Causation

First, the court explained that the Plaintiffs could meet the pleading standards for loss causation if they could plausibly allege that the merger caused NewAge to decline in value. (ECF No. 35 at 32.)  Accordingly, the court suggested that the Plaintiffs' Amended Complaint clarify 1) whether the Plaintiffs had voted to approve the merger; and 2) if the Plaintiffs could have stopped the merger or sold their shares before it was finalized had they known the truth. (Id. at 32.)  But the Amended Complaint still lacks details sufficient to show causation under this theory.

The Plaintiffs concede that they did not have voting or approval rights on ARIIX's merger with NewAge but contend that, had they known the truth, they could have blocked the merger by filing a derivative suit, asserting unidentified "dissenter rights," or selling off their existing shares.  (ECF No. 41 at 19 (citing Am. Compl. ¶ 117).)  Even if the Plaintiffs could have blocked the merger through these methods, this theory of loss causation fails because the Plaintiffs fail to plausibly allege, beyond mere speculation, that they could have obtained more value from their ARIIX shares had the merger been blocked.  See, e.g., In re Resolute Energy Corp. Sec. Litig., 2022 WL 260059, at *2–3 (3d Cir. Jan. 27, 2022) (finding there was no economic loss where appellant offered only speculative allegations that true market value was higher than merger consideration); Altimeo Asset Mgmt., 663 F. Supp. 3d at 368 (finding that courts have "not looked kindly on similarly attenuated theories of economic loss when articulated in securities fraud lawsuits"); Kuebler v. Vectren Corp., 412 F. Supp. 3d 1000, 1011

(S.D. Ind. 2019) ("That there <u>might</u> have been a better future prospect at some point in time had the shareholders held on to their shares is too speculative to state a claim ...."), <u>aff'd</u>, 13 F.4th 631 (7th Cir. 2021); <u>Beck v. Dobrowski</u>, 559 F.3d 680, 684 (7th Cir. 2009) (dismissing complaint where plaintiffs alleged that, but for misleading proxy solicitation, shareholders would have rejected buyout and thereafter reaped unspecified economic benefits of continuing to own shares).

Even accepting the Plaintiffs' conclusory assertion that they could have locked in a higher price for their ownership in ARIIX had they sold their shares privately before the merger, the Plaintiffs have not plausibly alleged that they ever had a concrete opportunity to sell their shares before the merger.  The Plaintiffs allege only that "ARIIX [provided some] investors an opportunity prior to the merger to sell their membership units back, thereby supporting a private market for such").)  These "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Khalik v. United Air Lines</u>, 671 F.3d 1188, 1193 (10th Cir. 2012) (citing <u>Ashcroft</u>, 556 U.S. at 663).  Without more concrete information about similar sellback transactions or specific offers, the court cannot infer that the Plaintiffs had any opportunity to sell their shares before the merger.  <u>See, e.g.</u>, <u>Trahan v. Interactive Intel. Grp., Inc.</u>, 308 F. Supp. 3d 977, 1000 (S.D. Ind. 2018) (finding no economic loss absent allegation of a definite, immediately available, superior alternative to the merger consideration and dismissing claims where alleged economic loss depended on the marketplace eventually valuing stock at higher than merger consideration at some indeterminate future date when plaintiff still held his shares and was willing to sell them); <u>Haideri v. Jumei Int'l Holding Ltd.</u>, 2021 WL 4170791, at *23–24 (N.D. Cal. Sept. 14, 2021) (holding that complaint's allegations about "true value" were speculative given lack of competing offers before or after tender offer).  <u>Compare</u> <u>Baum v.</u>

34

Harman Int'l Indus., Inc., 575 F. Supp. 3d 289, 299 (D. Conn. 2021) (loss causation adequately pled where complaint alleged that the defendant issuer had received a specific offer for its shares that was higher than merger consideration), with Kuebler v. Vectren Corp., 13 F.4th 631, 647 (7th Cir. 2021) (no economic loss pled where "plaintiffs do not even allege the existence of a viable superior offer").

### 2. Bankruptcy-Related Causation

Second, the court explained that the Plaintiffs could adequately plead loss causation if they could show how NewAge's excessive licensing payments to Kwikclick caused NewAge's bankruptcy. (ECF No. 35 at 31–32.) In their Amended Complaint, the Plaintiffs cite filings from the NewAge bankruptcy proceeding to make this causal link, arguing that the licensing fees paid to Kwikclick, along with the costs of ARIIX's internal investigation into FCPA violations at the company, "exacerbated [NewAge's] liquidity issues." (See Am. Compl. ¶¶ 133, 194, 198, 213.) The Plaintiffs analogize these circumstances to those in Nakkhumpun v. Taylor, in which the Tenth Circuit found the plaintiff plausibly established a causal link between the false or misleading statement and materialization of the risk, a fall in shareholder value, by arguing that the "stock price dropped at least partly because the market learned" the truth, that the defendant could not find a buyer at the advertised asking price. (See ECF No. 41 at 16–17 (citing 782 F.3d 1142, 1156 (10th Cir. 2015).) But Nakkhumpun is distinguishable because the Tenth Circuit determined that loss causation was sufficiently pled based on the defendant's failure to "point[] to any intervening events that would show disruption of the causal link as a matter of law." By contrast, NewAge's bankruptcy proceedings—which the Plaintiffs rely on in opposing dismissal—indicate that there were numerous intervening events before and after the merger that contributed to NewAge's insolvency. Specifically, NewAge's Disclosure Statement and Joint

Chapter 11 Plan of Liquidation states that the bankruptcy resulted from a wide range of factors, including the pandemic, supply chain issues, uncertainty related to business operations in China, issues in fully integrating new brands, and changes in management, along with expenses related to an investigation and defense of a potential violation of the FCPA. NewAge's Disclosure Statement and Joint Chapter 11 Plan of Liquidation does not even mention the costs NewAge incurred to license Kwikclick's CRM software. And the Plaintiffs do not explain how NewAge's payments to Kwikclick were significant enough to outweigh these intervening causes. See In re Williams, 558 F.3d at 1137 ("Even if the truth has made its way into the marketplace, Dura requires that a plaintiff show that it was this revelation that caused the loss and not one of the 'tangle of factors' that affect price." (quoting Dura Pharms., 544 U.S. at 343)).

Similarly, the court is not persuaded by the Plaintiffs' argument that the bankruptcy resulted from the Defendants' concealment or failure to disclose an internal investigation into uncharged FCPA violations. As this court and others have held, public companies are not required to disclose internal investigations into uncharged crimes. See Rumbaugh v. USANA Health Scis., Inc., No. 2:17-cv-106, 2018 WL 5044240, at *7 (D. Utah Oct. 17, 2018) (finding, in dismissing Section 10(b) claim, that the "law does not impose a duty to disclose uncharged, unadjudicated wrongdoing or mismanagement" even though the defendant was conducting an internal investigation into possible FCPA violation (citing Richman v. Goldman Sachs Group, Inc., 868 F.Supp.2d 261, 272–74 (S.D.N.Y. 2012)). Because NewAge and ARIIX were never charged with FCPA violations, the companies' failure to disclose the ongoing internal investigation is not a proper basis to plead securities fraud by omission.

### 3. ICONN-Related Causation

Third and finally, the court explained that the Plaintiffs could adequately plead loss

causation through the corrective disclosure framework if they could plausibly allege that they

had purchased additional shares of NewAge stock under the mistaken belief that NewAge would

have exclusive ownership of the ICONN software after the merger.  (ECF No. 35 at 31.)  To

argue loss causation under this framework, the court suggested that the Plaintiffs clarify whether

"information about ICONN was ever publicly available, whether false beliefs about ARIIX's or

NewAge's ownership of this software resulted in a higher price for NewAge shares, and whether

a subsequent revelation that the software had been licensed to Kwikclick caused a drop in share

price."  (Id.); see, e.g., Lentell v. Merrill Lynch & Co., 396 F.3d 161, 175 n.4 (2d Cir. 2005)

(acknowledging that loss causation can be established by a "corrective disclosure to the market"

that "reveal[s] ... the falsity of prior recommendations"); In re Omnicom Grp., Inc. Sec. Litig.,

597 F.3d 501, 511 (2d Cir. 2010) ("A fraud regarding a company's financial condition in May

2001, if concealed, may cause investors' losses in June 2002 when disclosure of the fraud is

made and the available public information regarding the company's financial condition is

corrected.").  If the Plaintiffs cannot plausibly allege that the public knew and believed that

ARIIX owned the ICONN software going into the NewAge merger, then the court cannot infer

that the decline in NewAge's stock price was caused by the market's realization of the truth

about ARIIX.  See Altimeo Asset Mgmt., 663 F. Supp. 3d at 364 ("In the paradigmatic case

involving a public issuer's falsely positive statement(s) or nondisclosure of negative information,

causation of loss is typically pled and established by either the drop of a security's public trading

price following (1) a 'corrective disclosure' or (2) the 'materialization of a concealed risk.'" (citing <u>In re Omnicom Grp. Sec. Lit.</u>, 597 F.3d at 511)).

As a preliminary matter, the court notes that the "materialization of a concealed risk" theory of loss causation is inapplicable to this case. The Plaintiffs do not allege that the Defendants concealed a "risk" related to the merger—rather, the Plaintiffs' claim that the Defendants concealed verifiable objective facts regarding ARIIX's ownership and transfer of the ICONN software to Kwikclick, which were then controverted by the September 2021 Press Release. (<u>See</u> Am. Compl. ¶ 76 (claiming that "ARIIX's ownership and development of the CRM system, including ICONN, was generally known throughout the highly competitive MLM industry," and that this disclosure was "corrected" by September 2021 Press Release).) This is a "corrective disclosure" theory of causation.

Through a "corrective disclosure" lens, it remains unclear <u>how</u> the "MLM industry" knew that ARIIX owned the ICONN software. While the Plaintiffs are not required to provide "[s]pecific facts" or supporting evidence for all their allegations, they must, consistent with the Supreme Court's <u>Iqbal</u> and <u>Twombly</u> standards, "provide some relevant information to make the claims plausible on their face." <u>Khalik v. United Air Lines</u>, 671 F.3d at 1193 (citing <u>Erickson v. Pardus</u>, 551 U.S. 89, 93 (2007); <u>Iqbal</u>, 556 U.S. at 663). They have not done so. The court finds that the Plaintiffs' loss causation allegations are conclusory and lacking in factual enhancement and therefore cannot be awarded a presumption of truth for the court's analysis of loss causation.

Further, as detailed above in court's discussion of the "myriad of factors" contributing to NewAge's bankruptcy, the Plaintiffs also fail to account for the alternative bases for NewAge's stock price decline in September 2021, examples of which are listed in NewAge's bankruptcy proceedings. <u>In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.</u>, 568 F. Supp. 2d 349, 360

(S.D.N.Y. 2008) (loss causation inadequately alleged where complaint did not rule out intervening causes in alleging loss causation).

Even if the Plaintiffs' allegations about the MLM industry's knowledge were sufficient to meet the pleading standards for a "corrective disclosure" or "materialization of concealed risk" theory of loss causation, the Plaintiffs' new allegations that the September 2021 Press Release "corrected" or cleared up any false misrepresentation pits the Plaintiffs' causation argument against their efforts to overcome the two-year statute of limitations.  In other words, if, as the Plaintiffs allege, the market learned about ARIIX's fraudulent transfer of intellectual property through reading NewAge's September 2021 Press Release, then surely the Plaintiffs were also on notice of the fraud.

In sum, even were the Plaintiffs' claims under Section 10(b) of the Securities and Exchange Act not barred by the statute of limitations, they must also be dismissed for failing to adequately plead loss causation.

### 4.  Leave to Amend

The Plaintiffs seek leave to amend their complaint a second time to better plead loss causation and "repackage" their arguments.  (ECF No. 41 at 25.)  The decision to grant or deny amendment is within the court's discretion, but "[r]efusing leave to amend is generally only justified upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment."  Frank v. U.S. West, Inc., 3 F.3d 1357, 1365 (10th Cir. 1993).  "[I]n considering any motion to amend, the court must consider the balance between ensuring plaintiffs enjoy ample opportunity to plead their case and preventing prejudice to defendants who have to defend

against multiple pleadings." <u>Gaddy v. Corp. of President of Church of Jesus Christ of Latter-Day Saints</u>, 665 F. Supp. 3d 1263, 1300 (D. Utah 2023).

The court rejects the Plaintiffs' request on the grounds of delay, futility, and failure to cure deficiencies by amendment previously allowed.  First, this case is nearly two years old.  "In the Tenth Circuit, untimeliness alone is an adequate reason to refuse leave to amend." <u>Duncan v. Mgr Dep't of Safety</u>, 397 F.3d 1300, 1315 (10th Cir. 2005) (citing <u>Frank</u>, 3 F.3d at 1365).

Second, the Plaintiffs have already been given clear instructions how to amend their loss causation pleadings based on the Defendants' prior motions to dismiss (ECF Nos. 18–20) and the court's July 2024 Order.  (ECF No. 35.)  Their failure to do so indicates an inability to cure the deficiencies, making a second amended complaint futile.  And even if the Plaintiffs could plausibly allege loss causation under a theory of corrective disclosure, the Plaintiffs' amended securities fraud claims would be barred by the two-year statute of limitations.

Finally, even if some of the Plaintiffs' claims regarding loss causation could be amended to meet the pleading standards, the court finds that doing so will prejudice the Defendants, who have already been burdened by having to respond to two complaints.  For these reasons, the court denies the Plaintiffs' request to amend and dismisses the first and second claims for violations of the Exchange Act with prejudice.

### 5.  Supplemental Jurisdiction

Because the court dismisses all claims over which it has original jurisdiction (the first and second claims), the court finds that it is in the interest of judicial economy, convenience, fairness

and comity to decline to exercise supplemental jurisdiction over the Plaintiffs' remaining state law claims. The court therefore dismisses claims three through six without prejudice.

## ORDER

For the foregoing reasons, the court ORDERS as follows:

1.      The court GRANTS the Defendants' motion to dismiss (ECF No. 37) and declines to allow the Plaintiffs further leave to amend.

2.      Counts one and two are dismissed with prejudice.

3.      Counts three through six are dismissed without prejudice.

DATED this 8th day of September, 2025.

BY THE COURT:

*Tena Campbell*

Tena Campbell
United States District Court Judge